## THE STATE v. GATLIN, Appellant,

Division Two, December 2, 1902.

1. **Murder:** EVIDENCE: ALIBI. It appeared that deceased had been called to the door of his house by a co-indictee of defendant, and shot, and that immediately after the shooting defendant entered, in company with a third party. Defendant testified that he had gone to accompany the third party, who had a message to deliver to a woman who lived there. Two women who lived in the house testified that just after the shooting defendant begged them to say nothing about his being there, and told them who did the shooting. The co-indictee testified that he went alone, and to compromise with deceased, they having been quarreling shortly before that. Fifteen minutes after the shooting, defendant went to a saloon, and called for "drinks on" deceased, saying he was "done dead." *Held* that it was proper to refuse to instruct on the subject of alibi.

2. ———: ———: CONSPIRACY. On a prosecution for murder, the killing having been done by a co-indictee of defendant, it was shown that there had been ill feeling between the defendant and the co-indictee on the one hand and the deceased on the other; that defendant had been urging on a quarrel between deceased and the co-indictee, and had given the co-indictee a revolver, and reproached him for not killing deceased in a certain encounter; that later the

defendant and the co-indictee were seen to converse together, and then the co-indictee went to deceased's home and shot him. *Held*, that a conspiracy to kill deceased was shown.

3. ———: CONSPIRACY: REFUSAL OF INSTRUCTION ON ALIBI. Where, on a prosecution for murder, it is shown that there was a conspiracy to murder deceased between accused and a co-indictee, an instruction on alibi is properly refused.

4. **Application for Continuance**: BILL OF EXCEPTIONS. An application for a continuance, not incorporated in the bill of exceptions, can not be reviewed on appeal.

5. **Juror**: NO OBJECTION OR EXCEPTION. Where no objection is made or exception raised to the presence of a certain person on the jury, no question thereon can be considered on appeal.

6. **New Trial**: ARGUMENT TO JURY: BILL OF EXCEPTIONS. Where one of the grounds for a new trial was certain statements in the argument to the jury, but on appeal the bill of exceptions does not show such statements, the question is not open to review.

7. **Evidence**: CONSPIRACY. The killing having been done by a co-indictee, testimony was admitted that previous to the killing the slayer had stated that he had had trouble with deceased, and was going to settle it with deceased, and that he had other "niggers" to go with him. *Held*, properly admitted, though defendant was absent when the statement was made, a conspiracy having been shown.

8. **Remarks of Court**: WITHDRAWAL. The court, in passing on an objection to testimony, remarked that there was evidence of a conspiracy, but promptly told the jury not to pay any attention to what he said. *Held*, that there was no error.

9. **Admission of Co-Indictee**: HARMLESS ERROR. Testimony of officers was admitted to the effect that a co-indictee had stated, when under arrest, that he did the killing. *Held*, that, if the admission of the testimony were error, it was harmless, the co-indictee having testified that he killed deceased.

10. **Appellate Practice**: OBJECTION TO ADMISSION OF EVIDENCE: NOT IN MOTION FOR NEW TRIAL. On appeal the question as to the propriety of admitting testimony can not be considered where no such matter is suggested in the motion for a new trial, and there is not even a general suggestion in the motion of the court's admission of illegal or incompetent evidence.

11. **Impeaching Witness**: TESTIMONY BEFORE CORONER. A co-indictee having testified for defendant, it was proper to admit the testimony of the co-indictee given before the coroner, it being competent to impeach him.

12. ———: TESTIMONY NOT LIMITED TO IMPEACHING PURPOSES: NO EX-

CEPTION. It was not error not to have limited the testimony to impeaching purposes, no instruction having been asked and refused and exception taken.

13. **Remarks of Counsel on Cross-Examination:** NOT ERROR. A co-indictee was testifying on cross-examination, when counsel said: "You laughed all the time when you were being tried for your life. You don't seem to realize the fix you are in, and now you are laughing in this case." *Held,* not error.

14. **Remarks of Court:** READING INSTRUCTIONS: FRIVOLOUS OBJECTIONS. In a criminal case the court said: "Now, gentlemen of the jury, I will read you the instructions for the State," and then proceeded to read instructions; and afterwards said: "Now, gentlemen, I will read you the defendant's instructions." *Held,* that a contention that the court's so addressing the jury was error, was frivolous.

15. **Appellate Practice:** OBJECTIONS AND EXCEPTIONS: WHEN REVIEWABLE. Objections and exceptions not incorporated in a motion for a new trial can not be considered on appeal.

Appeal from Butler Circuit Court.—*Hon. J. L. Fort,* Judge.

AFFIRMED.

*Phillips & Phillips* for appellant.

*Edward C. Crow,* Attorney-General, and *Jerry M. Jeffries,* for the State.

(1) Declarations of a co-conspirator are receivable against his fellows when they accompany or explain acts done in pursuance of a concerted criminal purpose, if made (as these were) during the pendency of the common criminal enterprise. State v. Melrose, 98 Mo. 594; State v. McGraw, 87 Mo. 161; State v. Duncan, 64 Mo. 262. (2) The court stated in the presence of the jury that there was some evidence tending to show a conspiracy. Defendant alleges that as grounds for a new trial. The statement was absolutely true, and truth, in a law suit, does not prejudice. Defendant's objection to a previous question called for the remark by the court. The trial judge immediately said

to the jury that he was passing upon an objection and that what he said about the evidence will not be considered by the jury at that or any other time. Certainly, no rights of defendant were violated, and by that he was not prevented a fair trial. (3) The application for a continuance in this case is not incorporated in the bill of exceptions; therefore, the question of its sufficiency can not be reviewed on appeal. Then, if the court did erroneously refuse the application, defendant can not be given relief on that ground. State v. Hancock, 148 Mo. 488. (4) The jury could not possibly have been prejudiced by the alleged statement of the judge: "Now, gentlemen of the jury, I will read you the instructions of the State," and afterwards, "Now, gentlemen, I will read you the defendant's instructions." Besides the improbability of the jury being affected by this, it is nowhere shown in the bill of exceptions, except in the motion for a new trial, that this statement was made by the trial judge. Statements in the motion for a new trial do not prove themselves. State v. Williams, 147 Mo. 14; State v. Grant, 144 Mo. 56; State v. Levy, 126 Mo. 554; State v. Clark, 147 Mo. 20.

SHERWOOD, P. J.—David W. Hill, prosecuting attorney of Butler county, filed an information against three negroes, Zeb. Crite, Ike Torrence and Wm. Gatlin, charging them with murder in the first degree, in that they with a revolver on September 10, 1901, shot and killed another negro, Thomas Graham. Each of those informed against was accorded a separate trial. Crite was first tried, found guilty of the first degree of murder, and his sentence not being executed at the time of defendant's trial, he was permitted to testify on behalf of defendant. The result of defendant's trial was the same as that in Crite's case, and defendant appeals.

He was employed as a porter on a railroad train, making his headquarters at Poplar Bluff, Missouri. On the night of September 10, 1901, he, with Ike Tor-

rence, who was likewise so employed as a porter on a railway train, reached Poplar Bluff at about nine o'clock a. m., where they would remain until about noon the next day as had been their custom at intervals of a few days for some months previous to that time.

It appears that defendant William Gatlin and Zeb Crite and Ike Torrence and Thomas Graham had had a difficulty over a negro woman, by name, Carrie Bryant, about a year previous to this time. Considerable enmity sprang up between them, especially between Crite and Graham, the defendant siding with Crite and espousing his cause. This enmity grew and continued until it ripened into a conspiracy on the part of Crite, Torrence and defendant Gatlin to kill and murder Graham.

On the morning of the 10th of September, about one o'clock, Crite, Gatlin, Tom Graham and another negro came into the Crown saloon, which Pat Hill kept, and the other three negroes were evidently trying to pick a quarrel with Tom Graham, and the latter was evidently alarmed, because he refused at first to drink when Gatlin asked him to do so. And Graham then told Pat Hill: " 'Mr. Pat, them niggers are trying to kill me,' and I says there is not going to be no racket in here, I am running this place, and if you want to fight, get outside; he finally came up and drank, and the whole push went outside, and came back and got another drink, but still agging a racket, and I asked them the second time to get out if they wanted to fight, and they all got back."

The parties went out and Gatlin was urging on a quarrel between Graham, commonly called "Tom," and Crite. This was the first time they went out and then they went behind the Crown saloon, where the quarrel was renewed, when Crite drew a revolver or had one in his hand, and threatened to shoot "Tom" and "Tom" picked up some rocks to defend himself, and told Crite just to raise his hand (the one with the revolver in it) and he would "shatter his brains

out," whereupon Crite, despite his revolver, took re-
fuge behind some box cars.

The parties, at least Gatlin, Crite and Torrence,
and perhaps one or two others, then returned to the
Crown saloon, the second time, "Tom" being absent,
when Gatlin reproached Crite with his failure in the
recent difficulty, and told Crite he was a coward, that
he had given him a gun to kill Graham with, but he was
afraid to use it.

Just after the encounter on the streets of Poplar
Bluff above alluded to, Graham went home and to bed.
Crite, Torrence and defendant Gatlin remained about
the saloons and restaurants of that place until a little
before day and during that time were seen to confer
and counsel together. At nearly daylight the three,
Crite, Torrence and defendant Gatlin, went to the house
where deceased was staying, the former knocking' at
the door, and when asked by a voice from within who
was there, said, "Lawyer Scott was there and wanted
to see Mr. Graham." Deceased went to the door in
his night clothes and when he opened the door Crite
without a word shot him, the ball striking the collar
bone. Deceased then turned and went to his room
where he sat down on the bed; Crite passed to the
window of that room, pushed the curtain back, took
deliberate aim, and fired, the ball piercing Graham's
heart, who got up, rushed into another room, sat down
in a chair, got up and lay down upon a bed in that
room. No sooner had deceased laid down on the bed
than Torrence and defendant Gatlin entered the room
and assisted others in carrying deceased back to his
own bed. Life passed out of Graham almost as soon
as defendant reached him.

Defendant took two women, Fanny Sanders and
Carrie Bryant, who were in the house where the homi-
cide took place, around the house, and begged each of
them, apart from the other, to say nothing about his
being there. At the time defendant took these women
around the house, he also told them "Zeb" (Crite),
had shot "Tom" and gone.

Defendant entered a plea of not guilty and testified that he started to the home of Fanny Sanders where Graham lived, that he went with Torrence for company, at the latter's request, who was going to the place mentioned to deliver a message to Fanny Sanders; that this was between three and four o'clock in the morning.

Torrence testified that the message mentioned by defendant was a message sent to Fanny Sanders by one "Gene," another negro, who having appropriated a guitar of some one else to his own use, and having left the State in consequence, was solicitous to know of Fanny Sanders whether he could safely return to the venue of the theft. But this message, though Torrence went to Fanny Sanders between three and four o'clock in the morning, he never delivered, asserting he became excited when he reached her house.

Defendant also testified that he and Torrence left for Fanny Sanders' house about twenty minutes after Zeb (or Crite) had left them at the Riverside saloon; that when he and Torrence got within a little over one hundred yards of Fanny Sanders' house, he heard two shots fired pretty close together, and meeting Hicks, who had just arisen from his bed and come out on the street, he stated that the shooting was over at Fanny Sanders'. How or why Hicks should know where the shooting was, and defendant not know, is not explained.

Torrence for the most part supported defendant about the incidents already related respecting the visit to Fanny Sanders', denied that he or defendant were present at the shooting there. Defendant also denied statements made by other witnesses that he had cursed Crite for failing to use the revolver on Graham, or that he kicked Crite's shins on the same account, or that he called for drinks on "Big Tom" fifteen minutes after the latter's death.

Capt. Hightower, an employee of the Crown Hotel also testified that on the same night, and just after the difficulty already mentioned, he was on duty in front

of the Crown Hotel (where the Crown saloon is located) and heard such a fuss out there where he was sweeping, between Crite, having a revolver in his hand, and Graham, Gatlin being also present, when Hightower, not wishing a fight to occur out there in front of the hotel, got "Tom" to drop his rocks, and to go on through the saloon; and after he left, Hightower testified that Crite and Gatlin remained, "and then" to use his language: "this Gatlin he cusses this Crite, because he didn't do something; saying 'he was a cowardly son of a bitch—backed you down with rocks and you got a gun in your hands, I would shoot his heart out'—this is all I know about it."

Crite testified that no one went with him to Fanny Sanders'; that he went alone; that although Tom Graham had only twenty to thirty minutes before abused him most vilely and told him that he would rather drink his heart's blood than a glass of whiskey, and said to him, " 'Nigger, I will kill you between this and daylight, if not then, between this and Saturday night'— that was the last words he ever said to me;" yet Crite testified that notwithstanding this, he went over to Fanny Sanders,' where Tom lived, to "*compromise with him,*" by telling him he (Crite) would let Carrie Bryant alone, if he (Tom) would let him (Crite) alone. That carrying out this *peaceful* measure, he went on to Fanny Sanders'; went up to the door and called to Tom, awaked him and told him "Zeb" "wanted to see him," whereupon Tom came to the door, and "made at him," when he jumped back and shot him; but he did not pretend to offer any excuse why he shot Tom the second time with such fatal effect, especially so, after Tom had been seriously wounded and had retreated into his room, and was seated on his bed. But Crite is contradicted by Fanny Sanders on two points, first, about Lawyer Scott's name being announced, and, second, as to "Zeb" being alone, when he came to her house; she says *three* men came there together that night, and one called "Tom" and said Lawyer Scott wanted to see him.

Crite is also contradicted by Bozarth, bartender at Tom Morris's saloon, as to Crite's being alone when he went over to Fanny Sanders', and as to Crite's going over there to effect a compromise with "Tom" because Bozarth testified that on that same night, and just after the brawl between Crite and Tom Graham, the former was sitting out in front of the saloon, and witness went out there and sat down; that "Crite was out there and come and set down by me; I had seen the boys there at the Crown saloon before that, and I asked Crite what was the matter over there, and he said him and big Tom had some trouble, and that he was going over and settle it, and in case big Tom come up with anything, he was as well fixed as big Tom was, and he had three other niggers to go with him, and that his gun was a thirty-eight, I believe he said; I told him not to do it, and he said 'yes, he was going to settle it, and the boys was going with him—Gatlin, Torrence and some one else.'" . . . "He said Will Gatlin had been kicking his shins because he did not kill Tom at the Crown saloon—that Will was kicking him because he did not do it over there." Bozarth also tesified that just about daylight, Gatlin with some one else came into the saloon where he kept, and said: "Give us a drink on old big Tom, he's done and dead."

Fanny Sanders also testified that Crite had, in her presence, threatened to kill "Tom"; that "Tom was always after him and imposing on him, and that he (Crite) was going to kill him."

Torrence also states that just before Crite left them, which was just before the shooting, the morning of the 10th of September, he and Gatlin and witness were in the Riverside saloon together.

Gatlin also testified to the same thing, and that after getting some cigars at his train box, he and Torrence started for Fanny Sanders' house.

The above testimony shows quite plainly, that from one o'clock on the morning of September the 10th, down to nearly daylight, Gatlin, Crite and Torrence were together, and the incidents already related, as

well as some others to be found in this record, show a settled hatred on the part of at least Gatlin and Crite toward Tom Graham, and a firm and common design to take his life; in short, a conspiracy to effectuate that murderous purpose; and Crite testified he carried that purpose into bloody execution. And such conspiracy being shown to exist, everything said or done, or admission made, during its existence by the parties thereto, in regard to the intended crime or in respect to its accomplishment and relating to the same, is equally binding on all the conspirators.

On the part of the State, the court gave the following instructions:

"1.   The court instructs the jury that the information in this cause is a mere formal accusation and does not of itself constitute any evidence of guilt.

"2.   The court further instructs the jury that if you believe and find from the evidence in this cause that one Zeb Crite, in the county of Butler and State of Missouri, at any time prior to the 14th day of September, 1901, willfully, deliberately, premeditatedly and of his malice aforethought, shot, with a pistol, and by shooting killed Thomas Graham, and that the defendant, William Gatlin, was then and there present, willfully, deliberately, premeditatedly, and of his malice aforethought aiding, helping, abetting, assisting, comforting, maintaining, moving or inciting the said Zeb Crite in so shooting and killing said Thomas Graham, then defendant William Gatlin, willfully, deliberately, premeditatedly and of his malice aforethought, shot and killed Thomas Graham, within the meaning of this instruction, and is as guilty under this information as if he had fired the pistol himself, and if you find the above facts, you will find the defendant guilty of murder in the first degree.

"3.   The court instructs the jury that the word 'willfully' as used in these instructions, means intentionally, not accidentally. 'Deliberately' means, in a cool state of blood, it does not mean brooded over or reflected upon for a week, a day or an hour, but it

means an intent to kill, executed by the defendant in a cool state of the blood, in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some provocation. 'Premeditatedly' means thought of beforehand for any length of time, however short. 'Malice' as used in the information, does not mean in the legal sense, mere spite, ill will or dislike, as it is ordinarily understood, but it means that condition of mind which prompts one person to take the life of another without just cause or justification, and signifies the state of disposition which shows a heart regardless of social duty and fatally bent on mischief. And 'malice aforethought' means that the act was done with malice and premeditation.

"4.   The court instructs the jury that evidence is of two kinds, direct and circumstantial. Direct evidence is when a witness testified directly of his own knowledge of the main fact or facts to be proven. Circumstantial evidence is proof of certain facts and circumstances in a certain case from which the jury may infer other and connected facts which usually and reasonably follow, according to the common experience of mankind. Crime may be proven by circumstantial evidence, as well as by direct testimony of eyewitnesses; but the facts and circumstances in evidence should be consistent with each other and with the guilt of the defendant, and inconsistent with any reasonable theory of defendant's innocence.

"5.   The court further instructs the jury that if verbal statements of the defendant have been proven in this case, you may take them into consideration with all the other facts and circumstances proven. What the proof may show you, if anything, that the defendant has said against himself, the law presumes to be true, because said against himself, but anything you may believe from the evidence that the defendant said in his own behalf, you are not obliged to believe, but you may treat the same as true or false, when consid-

ered with a view to all the other facts and circumstances in the case.

"6. The law presumes the defendant innocent of the crime charged against him in this information, and the burden of proving him guilty thereof, beyond a reasonable doubt, rests upon the State. Now, if after a full and fair review of all the evidence in the cause you entertain a reasonable doubt of defendant's guilt, you should give him the benefit of such doubt and acquit him, but such doubt, to authorize you to acquit him on that ground alone, should be a substantial doubt touching his guilt and not a mere possibility of his innocence.

"7. The jury are the sole judges of the credibility of the witness and of the weight and value to be given to their testimony. In determining as to the credit you will give a witness, and the weight and value you will attach to a witness's testimony, you should take into consideration the conduct and appearance of the witness upon the stand, the interest of the witness, if any, in the result of the trial, motives actuating the witness in testifying, the witness's relation to, or feeling for or against the defendant, or the alleged injured party, the probability or improbability of the witness's statements, the opportunity the witness had to observe and to be informed as to matters respecting which such witness gives testimony, and the inclination of the witness to speak truthfully or otherwise as to matters within the knowledge of such witness. All these matters being taken into account with all other facts and circumstances given in evidence, it is your province to give each witness such value and weight as you deem proper. If, upon a consideration of all the evidence, you conclude that any witness has sworn willfully falsely as to any material matter involved in the trial, you may reject or treat as untrue the whole or any part of such witness's testimony.

"8. The court instructs the jury that the defendant is a competent witness in this case and you must consider his testimony in arriving at your verdict, but

in determining what weight and credibility you will give to his testimony in making up your verdict, you may take into consideration, as affecting his credibility, his interest in the result of the case, and that he is the accused party on trial testifying in his own behalf.

"9. The court further instructs the jury that if you convict defendant of murder in the first degree, you will by your verdict simply say so, in that case you have nothing to do with the punishment. And if you find the defendant not guilty of any offense, you will return a verdict to that effect.

"10. You will now, gentlemen of the jury, listen to the arguments of counsel, who will endeavor to aid you to reach a proper verdict, in this cause, by refreshing in your minds the evidence which has been given to you in this cause, and by showing the application thereof to the law; but whatever counsel may say you will bear in mind that it is your duty to be governed in your deliberations by the evidence, as you understand it and remember it to be, and by the law as given in these instructions, and render such verdict as in your conscience and reason and candid judgment, seems to be just and proper.

"11. The court instructs the jury that under the evidence in this case you will either find the defendant guilty of murder of the first degree or acquit him."

To all of which instructions defendant objected and excepted.

Defendant's counsel then asked these instructions which were refused:

"1. Now at the close of all the evidence adduced on behalf of the State in the trial of this case, the court instructs you, gentlemen of the jury, that under the law and the evidence, your verdict herein should be for the defendant.

"4. The court instructs the jury that you are the sole judges of the credibility of the witnesses and of the weight and value to be given to their testimony. In determining the credit you will give to a witness,

and the weight and value you will attach to a witness's testimony, you should take into consideration the conduct and appearance of the witness on the stand, and the interest of the witness, if any, in the result of the trial, the motives of the witness in testifying, and the relation or feeling for or against the defendant, or the alleged injured party, or the probability or the improbability of the witness's statements and the opportunity the witness had to observe and be informed as to matters respecting which said witness gives testimony, and the inclination of such witness to speak truthfully or otherwise, as to matters within the knowledge of such witness. All of these matters being taken into account, with all the other facts and circumstances given in evidence, it is your province to give to each witness such credit, and the testimony of each witness such value and weight as you deem proper. If upon a consideration of all the evidence you conclude that any witness has sworn willfully false, as to any material matter involved in the trial, you may reject or treat as untrue the whole or any part of such witness's testimony.

"5. The court instructs the jury that the information in this case is of itself a mere accusation or charge against the defendant, and is not evidence of the defendant's guilt, and no juror should permit himself to be in any way influenced against the defendant, because or on account of the indictment in this case; and you are further instructed that in this case the law does not require the defendant to prove his innocence, but the law requires the prosecution to prove the defendant guilty in the manner and form as charged in the indictment beyond a reasonable doubt, and unless the State has done this, the law makes it your duty to find the defendant not guilty.

"6. The court instructs the jury that the law presumes the innocence and not the guilt of the defendant, and this presumption of innocence attends the defendant throughout the trial, and at the end entitles the defendant to an acquittal unless the evidence

in the case, when taken as a whole, satisfies you of the defendant's guilt beyond a reasonable doubt, as defined in these instructions.

"7. The court instructs the jury that the defendant alleges as a defense in this cause an alibi, that is, he says he was not present at the time and place of the alleged killing, but was elsewhere. Now if the jury find from the evidence in the cause that the defendant was elsewhere than at the place of the alleged killing, then you should find the defendant not guilty, and if upon a full consideration of all the evidence in the cause the jury have a reasonable doubt as to said alibi, you should acquit him."

To which refusal, exceptions were saved.

The court, however, gave these instructions asked for defendant.

"2. The court instructs the jury that before the defendant in a criminal case can be convicted, wherein the prosecution relies on circumstances to establish his guilt, each material fact in the chain of facts from which the defendant's guilt is to be inferred must be proved by the same weight, degree and force of evidence as if it were the main fact of the defendant's guilt; and all of such facts must be consistent, each with the others, and with the defendant's guilt, and must exclude to a moral certainty every reasonable theory except that of the defendant's guilt.

"3. The court instructs you, gentlemen of the jury, that before you convict the defendant in this case, you must find and believe from the evidence and beyond a reasonable doubt either that prior to the shooting of Thomas Graham by Zeb Crite there was a common purpose or agreement between this defendant and the said Crite that the life of Graham was to be taken, and that deceased was shot and killed in furtherance of such fixed design, intent or common purpose in the minds of Crite and this defendant, or, that prior to the shooting there existed in the mind of Zeb Crite a fixed purpose to take the life of Thomas Graham of which this defendant had knowledge and that this defendant

State v. Gatlin.

did some act in furtherance of the accomplishment of such fixed design or intention."

The instructions heretofore mentioned as having been given at the instance of the State were very fair to defendant, and such as were given at defendant's instance the statute does not allow him to complain of.

As to those refused him, with the exception of the one to be presently discussed, they were properly refused either as having been covered by those previously given, or as being erroneous.

This brings us to consider instruction 7 asked by defendant touching the subject of alibi. When we consider how flimsy and unsubstantial was the pretense made by Torrence of carrying a message of no importance to Fanny Sanders, at the unseemly hour of about three or four o'clock in the morning, and the fact that such message was never delivered; when we consider the equally flimsy pretense made by Crite about going on an errand of *compromise* to Tom Graham, who had threatened not more than two hours before to kill him before daylight, and had also told him he would rather drink his heart's blood than a glass of whiskey; when we consider how well Crite was contradicted as to what he said to Graham, when he called the latter to the door; when we consider how thoroughly Crite was contradicted as to his being alone when he went to Fanny Sanders' door; when we consider how defendant was contradicted and impeached by Fannie Sanders and Carrie Bryant as to his request made to them to say nothing about his being at their house; when we consider that within fifteen minutes after Graham's death, defendant went to Tom Morris's saloon and called upon Bozarth to "Give us a drink on old big Tom, he's done dead;" when we consider how close on the heels of Crite defendant and Torrence followed, we are constrained to reach the same conclusion reached by the trial court, that no instruction embracing alibi should have been given.

Besides, inasmuch as a conspiracy on the part of

Vol 170 mo—24.

defendant and Crite, at least, to kill Graham, was so abundantly established, it made no difference whether defendant was present or absent when the murder was committed, and so an instruction on alibi would have misled the jury.

With reference to the application for a continuance, it is not before us for review since not incorporated in the bill of exceptions. [State v. Griffin, 98 Mo. loc. cit. 675, and many subseq. cas.]

With reference to allowing the juror Durmington to remain on the jury, there were no objections made or exception saved to this, and consequently the point is not before us for consideration.

Complaint is made that error occurred in permitting John Raney, one of State's counsel to say so and so in his argument to the jury. But the bill of exceptions contains no such statement of counsel, and the recitals in motions for a new trial do not prove themselves; and so this court has frequently decided.

Relative to the contention made that the court should not have admitted in evidence the testimony of Bozarth as to conversation had with Crite about going over to Fanny Sanders' house to settle it with Tom Graham, and taking defendant and Torrence along with him, as already set forth; it was entirely competent albeit defendant was absent, since there was abundant evidence of a conspiracy having been formed as heretofore set forth. And, in this connection, the inadvertent remark of the trial judge in passing on defendant's objection to Bozarth's testimony, that there was evidence of a conspiracy, was promptly remedied by his telling the jury he was simply passing on the objection, and not to pay attention to what he said about the evidence. This explanation to the jury left defendant no ground for complaint.

A number of officers testified that Crite, while under arrest, had admitted to them while in their custody, that he had shot and killed Tom Graham. Whether this testimony was rightfully or wrongfully admitted is wholly unimportant, since Crite afterwards

went upon the stand and testified that he did that very thing. So that, if error there was in admitting the testimony of such officers, it was of the harmless variety.

With respect to admitting the testimony of Pat Hill as to what Graham said to him, there is no such matter suggested in the motion for a new trial, nor is a general suggestion made in such motion of the court's admission of illegal and incompetent evidence on the part of the State; consequently no attention can be paid to such contention.

It is insisted that error was committed in permitting the cross-examination of defendant to extend beyond the limits fixed by the examination in chief, to which insistence the reply is that even if such a crossing of the line of inquiry actually occurred, it was about such an immaterial matter as not to injuriously affect defendant's cause.

Concerning the admission in evidence of Crite's testimony as taken and written down before by the coroner, there was no error in this, as the evidence was entirely competent wherewithal to impeach Crite who was defendant's witness; and if defendant wanted that testimony limited to such purpose, an instruction should have been asked, and an exception saved, in case of refusal. [State v. McMullin, 170 Mo. 608.]

Another ground stated in the motion for a new trial is, that "The court erred in reading instruction 7 asked by the defendant and afterwards remarking in their hearing, 'This instruction should not be given,' and then telling them that they should not consider the same orally." The bill of exceptions being consulted, shows no such language used by the court.

It is also urged in the motion for a new trial that: "The court erred in permitting Lewis F. Dinning, one of the counsel for the State, to say in the presence and hearing of the jury while cross-examining Zeb Crite: 'You laughed all the time when you were being tried for your life, you don't seem to realize the fix you are in and now you are laughing in this case.'" How

this remark could possibly have prejudiced defendant's case, we are not informed.

Finally, this last point is urged upon our attention: "The court erred in addressing the jury as follows: 'Now, gentlemen of the jury, I will read you the instructions for the State,' and then proceeding to read instructions numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11. And afterwards saying 'Now, gentlemen, I will read you the defendant's instructions,' and then reading defendant's instructions numbered 2 and 3." This objection is simply frivolous.

Having thus commented on all the points urged in the motion for a new trial, no objections or exceptions, even though properly saved at the time, and not incorporated in such motion, can be noticed in this court.

Having carefully read this unindexed record and discovering no prejudicial error therein, we affirm the judgment and direct that the sentence pronounced by the law be executed. All concur.