STATE of Missouri, Respondent,

v.

Floyd B. NEWBERRY, Appellant.

No. 61695.

Supreme Court of Missouri,
Division No. 1.

Sept. 9, 1980.
Rehearing Denied Oct. 15, 1980.

Robert Beaird and John P. Burnett, Kansas City, for appellant.

Paul R. Otto and Paul Spinden, Asst. Attys. Gen., Jefferson City, for respondent.

WELBORN, Commissioner.

Appeal from conviction for murder in the first degree upon jury trial, resulting in judgment of guilt and sentence to life imprisonment.

On June 18, 1976, at about 4:00 P.M., appellant Floyd B. Newberry called sheriff's deputies to his residence in Oakwood, Clay County, Missouri. The officers found the body of appellant's wife, Roxanne Newberry, in her bedroom. Her throat had been slashed and she had stab wounds in her chest. Subsequent laboratory tests indicated that she had been raped and sodomized. Appellant told investigating officers that he had left the house at around 7:30 A.M. and returned to find his wife's body at around 4:00 P.M.

On December 19, 1978, a Clay County grand jury indicted appellant for murder in his wife's death. Appellant's involvement was based upon information provided by his father, Floyd W. C. Newberry. The father, who had abandoned appellant at an early age, had an extensive criminal record. He had been convicted of assault in Minnesota and served a prison sentence for that offense. He had been convicted of assault in Kansas and placed on probation. He had been convicted in Missouri of issuing an insufficient funds check and served a prison sentence for that offense. When he made the statement implicating appellant in his wife's death, the father was in federal custody on a counterfeiting charge. He testified at appellant's trial upon an assurance that for his admitted role in Roxanne's death, he would be charged with second degree murder and that any sentence which he received would be served concurrently with the federal sentence which he was then serving.

According to the father's testimony at appellant's trial, appellant had approached him in February and March, 1976, about killing Roxanne. According to the father, appellant said he and his wife were not getting along well and they had financial problems which appellant proposed to solve by collecting some $300,000 insurance upon his wife's death. The father said that appellant promised him $60,000 to do the job and when he agreed to cooperate, his son gave him a promissory note for $105,000 to assure his payment.

According to the father, he asked Charles White, an employee of the father's upholstery business, to do the killing and White readily agreed to do so. The father and White concocted a plan to kill Roxanne at her place of employment. They knew that Roxanne made trips to the bank on her job and brought back money for her employer. They planned to make her death appear the result of a robbery. On April 22, 1976, the father drove White to the area of Roxanne's place of employment and let him out. When Roxanne entered the building carrying $1300 in cash, White struck her with an iron pipe and shot her. He took $400 of the money and fled. The father picked him up and White told him "It's all over with." The father had provided White with the .22 automatic Strum Luger with which Roxanne was shot.

The injuries Roxanne received were not fatal. She was taken to a hospital and subsequently recovered. According to the father, plans to kill Roxanne in the hospital were discussed but discarded because "there was no way to get to her in the hospital."

In recuperating from her injuries, Roxanne visited an aunt in Florida. The father said appellant provided him with her address there and plans were made to get her in Florida.

The father provided White and Rodney Strickland with bus tickets to Florida. Strickland, according to the father, was brought into the picture at White's request. Strickland, testifying at appellant's trial confirmed that he and White went to Florida. He denied that he had been a party to a conspiracy to kill Roxanne. He said that he went on the trip because White asked him and that he understood that the purpose of the trip was to pick up a package for the father. Strickland acknowledged that, after they had been in Florida for several days, White told him he was supposed to kill someone but he did not name the intended victim and the two spent most of the time in a hotel room, drinking.

According to the father, after White and Strickland returned from Florida, appellant and the father made a practically non-stop

trip to Florida in the appellant's automobile. Appellant pointed out to the father where Roxanne was staying and the two returned immediately to the Kansas City area. The father stated that the trip took approximately 30 hours.

Around May 27, 1976, the father and Strickland flew to Florida. At 1:59 A.M. on May 27, 1976, a police officer in Miami Shores, responding to a call about prowlers looking into the window of a house on 102nd Street, found the father and Strickland in that vicinity. They told the officer that they were looking for someone. The officer advised them to make the search at a more appropriate time. The two promptly returned to Kansas City. The aunt whom Roxanne was visiting lived on 102nd Street in Miami Shores.

According to the father, although he was actively participating in the scheme, he was also trying to discourage it. He said that when he and his son drove to Florida and he saw where Roxanne was staying, he told his son that it was impossible to get in the place. He said that when he and Strickland were there, he tried to make himself conspicuous in the hope that someone would see him.

In any event, Roxanne returned to her home and the father and appellant proceeded with planning to dispose of her. A scheme was devised whereby appellant was to leave the house early, leaving it unlocked to permit White's entrance and carrying out the plan. On two occasions, the father, White and Strickland went to a schoolhouse directly behind the Newberry residence. Strickland heard them discussing a planned robbery, and using knives. According to the father, White did not go to the house when Strickland was along because the police were "too thick" around there.

At around 7:00 A.M. on June 18, the father drove White to the vicinity of his son's house and let White out at the schoolhouse. The father returned to the schoolhouse after 15 to 20 minutes and picked up White. White told him that he had killed Roxanne.

According to the father, White told him that he entered through the unlocked basement door and sat on the basement steps. Appellant opened the door at the top of the stair, saw White, nodded, and turned and left. White entered the house and found Roxanne in her bedroom. He tied her hands and feet, had sexual intercourse with her and then stabbed her and cut her throat.

When the father was arrested on the counterfeiting charge, a .22 Luger was taken by arresting officers and ballistic tests connected the weapon with the assault upon Roxanne at her place of employment. White was also arrested on the counterfeiting charge. A knife was taken from his possession. Tests revealed that hair found on the knife matched Roxanne's hair.

In this Court, appellant contends that the trial court erred in overruling his motion for a judgment of acquittal "because the testimony of the alleged accomplices was inherently suspect and incredible, intrinsically lacked credibility, was patently self-destructive and contradictory so as to rob it of all probative force, and was conclusively impeached by other evidence." Appellant's attack is primarily upon the testimony of Floyd W. C. Newberry. He points out that the father testified that he was to receive $60,000 for his part in the murder but that he was given a note for $105,000 to guarantee payment for carrying out the plan and that no explanation was given for the difference. He points to the father's testimony that, following Roxanne's death, he made no effort to obtain payment from appellant. He argues that the father implicated his son only after receiving a promise that any time he would receive for his part in the murder would be served concurrently with his federal sentence and outside Missouri. He notes that the father testified that, although he was furnishing personnel and weapons for the murder and was making trips to Florida to carry it out, he was also trying to convince his son to abandon the scheme. He finds the father's testimony that he and his son made a nonstop auto trip to Florida in some 30 hours contrary to physical facts in view of the 1600–mile dis-

tance between Kansas City and Miami. He notes that the father testified that he and Strickland made a trip to Florida on May 26, 1976, at the request of appellant in order to carry out the scheme, but the aunt with whom Roxanne stayed testified that she returned to Kansas City on May 26, at appellant's request, arguing that this testimony would have the son sending the actors to Florida at the same time that he had requested his wife to return home.

Appellant also contends that Strickland's denial of any role in a conspiracy to murder directly contradicted the father's testimony that Strickland was involved, leaving the state's evidence on the scheme from alleged participants directly contradictory.

Appellant cites cases recognizing the general rule that when the state's evidence is "inherently incredible, self–destructive or opposed to known physical facts" it will not be sufficient to permit a jury to find the defendant guilty beyond a reasonable doubt. *State v. Dupepe,* 241 S.W.2d 4, 7[3–5] (Mo.1951); *State v. Harris,* 295 S.W.2d 94 (Mo.1956); *State v. Powell,* 433 S.W.2d 33 (Mo.1968). Significantly, in none of the cases cited by the appellant did the appellate court find the evidence involved so lacking.

■ Other general rules apply here. " * * * A defendant is not entitled to a judgment of acquittal because of discrepancies or conflicts in the testimony of the state's witnesses. *State v. Cox,* 478 S.W.2d 339, 341 (Mo.1972). Conflicts in the evidence, the determination of the credibility of the witnesses and the weight to be given their testimony are within the peculiar province of the jury. *State v. Kellick,* 521 S.W.2d 166, 167 (Mo.App.1975). The fact that a witness' testimony may to some extent be contradictory does not prevent its constituting substantial evidence. Inconsistencies in testimony are questions for jury resolution. *State v. Hodges,* 537 S.W.2d 886, 887 (Mo.App. 1976); *State v. Collett,* 526 S.W.2d 920, 925 (Mo.App.1975). The testimony of a single witness may be considered sufficient although the testimony may be inconsistent. *State v. Platt,* 496 S.W.2d 878, 880–881 (Mo.App.1973)". *State v. Longmeyer,* 566 S.W.2d 496, 499–500[1–8] (Mo.App.1978). The inconsistencies in the father's testimony did not make it inherently incredible or self–destructive. In significant respects, the testimony was corroborated and the credibility of the witness in the light of the circumstances of his statement involving appellant was for the jury. The conflict between the testimony of the father and Strickland was not destructive of the state's case. *State v. Jones,* 363 Mo. 998, 255 S.W.2d 801, 804–805[4, 5] (1953). The evidence, viewed favorably to the state, was sufficient to permit a finding of guilt beyond a reasonable doubt.

■ Appellant complains of the failure of the court to give a proffered alibi instruction. The instruction offered was in the form of MAI–CR 3.20, requiring an acquittal unless the jury found beyond a reasonable doubt "the defendant's presence at the time and place the offense is alleged to have been committed * * *." The state's theory was not premised upon appellant's presence at the time that Roxanne was killed. The state's evidence did show that he admitted the killer into the house, but then left and did not return for several hours. The state's theory was that defendant was involved in a conspiracy to kill his wife. In such situation, the absence of the defendant from the scene at the time of the killing was immaterial and the trial court properly refused the alibi instruction. *State v. Gatlin,* 170 Mo. 354, 70 S.W. 885, 890 (1902); *State v. Spica,* 389 S.W.2d 35, 52[25] (Mo.1965).

Appellant asserts that *State v. Bobbitt,* 228 Mo. 252, 128 S.W. 953 (1910) is "exactly in point" and would require an alibi instruction. *Bobbitt* was a prosecution for attempted arson. The state's evidence showed Bobbitt and a codefendant present and actively participating with several others in the offense. The defense evidence was that neither Bobbitt nor his codefendant was present, but were elsewhere, and that they knew nothing of a conspiracy to set fire to the house involved. The court held that in view of the fact that the state's

case was submitted on two theories, conspiracy and active participation, the jury should have been instructed that if it found no conspiracy it should acquit the defendant if they had reasonable doubt as to the presence of defendant at the scene of the crime. 128 S.W. 959. In this case, the state's theory was conspiracy, there was no denial of the conspiracy and the case was submitted on a conspiracy theory, not on the theory that the defendant was present and personally participating in the crime. *Bobbitt* is not controlling.

■ Appellant complains of the admission in evidence of three color photographs showing the victim lying in her bedroom with her throat cut. The photographs were taken shortly after investigating officers arrived at the Newberry residence. Appellant argues that the photographs did not tend to prove any material element of the state's case and that any probative value they might have had was outweighed by their prejudicial effect.

"The trial courts have a wide discretion in determining the admissibility of photographs. *State v. Stevens*, 467 S.W.2d 10 (Mo.1971); *State v. Crow*, 486 S.W.2d 248 (Mo.1972); *State v. Duisen*, 428 S.W.2d 169 (Mo.1967). It has generally been held that even though a photograph may be inflammatory it is admissible if it tends to prove any material element of the State's case; this includes the issues of identity, condition and location of the body, nature or location of wounds, and the cause of death; and, generally, if the photograph corroborates the oral testimony of the state or refutes defense testimony it is admissible. *State v. Duisen*, 428 S.W.2d 169 (Mo.1967); *State v. McDaniel*, 336 Mo. 656, 80 S.W.2d 185 (1935); *State v. Stevens*, 467 S.W.2d 10 (Mo.1971); *State v. Crow*, 486 S.W.2d 248 (Mo.1972); *State v. Clark*, 494 S.W.2d 26 (Mo.1973). And a photo is not made inadmissible because the oral testimony may have described what is shown in the photo. *Stevens*, supra." *State v. Jackson*, 499 S.W.2d 467, 472[5–8] (Mo.1973).

In this case, the photographs showed the location and position of the victim's body, established her identity, depicted how the body was bound, showed the nature of the wounds and corroborated the testimony of Floyd W. C. Newberry.

Appellant relies upon *State v. Robinson*, 328 S.W.2d 667, 671[3], [4] (Mo.1969), and *State v. Floyd*, 360 S.W.2d 630 (Mo.1962). In *Robinson*, after holding that other errors required reversal of the conviction, the court condemned photographic evidence introduced by the state as "extremely obscene, offensive, vulgar, horrid, and repulsive." Just what provoked the court's reaction cannot be gleaned from the opinion. *Floyd* involved photographs of a badly decomposed body which could have no probative value. *Robinson* and *Floyd* have been regularly distinguished in subsequent cases. No case has been found subsequent to *Floyd* in which admission of a photograph of the victim has been held error.

In this case, the trial court's determination that the probative value of the photographs justified their admission into evidence has not been demonstrated to have been an abuse of discretion.

■ Appellant complains of Instruction No. 11, given by the court, as follows:

"A conspiracy to commit a crime occurs when two or more persons agree, combine or confederate to commit a crime and one or more of such persons to the agreement does some overt act in furtherance of the agreement."

This non–MAI instruction was followed by Instruction No. 12, MAI–CR 2.10, on responsibility of parties to a criminal activity. Appellant complains that Instruction No. 11 had no basis in law, not being authorized by MAI–CR, was misleading and confusing because it conflicted with Instruction 12 and because it amounted to an indication that the judge believed that a conspiracy had been proved.

MAI–CR contemplated that MAI–CR 2.10 would be used in cases involving a conspiracy to commit an offense. The Notes on Use to MAI–CR 2.10 provided, in

part, that such instruction "should be used where there is evidence * * * (c) that defendant was a member of a conspiracy to commit an offense, where the offense submitted is other than the separate and independent crime of conspiracy, a misdemeanor under V.A.M.S., Section 556.120." Rule 20.-02(c) required an applicable MAI–CR instruction to be used to the exclusion of any other instruction on the subject. However, under 20.02(e) the prejudicial effect of giving an instruction in violation of the rule must be judicially determined.

The question then becomes whether or not Instruction No. 11 was prejudicial to appellant. The complaint that Instruction No. 11 conflicted with No. 12 and therefore confused the jury must be rejected. As the Notes on Use to MAI–CR 2.10 state, that instruction, given in this case as No. 12, is the instruction for use in case of a conspiracy to commit a crime. This is a clear indication that such instruction includes a conspiracy situation so that a separate definition of conspiracy would not be in conflict with MAI–CR 2.10. Cases have recognized the consistency of charging in terms of conspiracy and also, in the same case, of complicity in the acts of others. See *State v. Stidham*, 449 S.W.2d 634, 637–638[1], [2] (Mo.1970); *State v. Lackmann*, 12 S.W.2d 424 (Mo.1928); *State v. Clymer*, 159 S.W.2d 808, 811–812[8] (Mo.1942).

■ The complaint that Instruction No. 11 amounted to a direction by the court that a conspiracy had been proven is without merit. Instruction No. 11 directed no finding on the part of the jury. It attempted only a definition and cannot be said to amount to a declaration by the court that a conspiracy existed any more than Instruction No. 12 amounted to a declaration by the court that appellant acted with others in the offense.

Instruction No. 11 was unnecessary but it was not prejudicial to appellant.

■ On June 25, 1979, the date that trial of the case began, the defendant filed a motion to dismiss, alleging that he had been arraigned on the charges on December 19, 1978, and that more than 180 days had elapsed since the arraignment. The motion alleged that defendant had not requested a continuance of the case or filed any pre-trial motions which might have delayed it; that the delay had been occasioned by the state and therefore the case should be dismissed for failure to comply with the time limits fixed by Section 545.780, RSMo 1978.

The motion was taken up by the court. The defendant's counsel stated that he had nothing to add to the motion. The prosecutor pointed out that defendant had moved for a change of venue and also filed previously a motion to dismiss. Counsel for defendant disagreed that the change of venue caused any delay and asserted that the defendant had asked for an earlier trial. The court overruled the motion. That ruling is assigned as error here.

Section 5445.780 provides, in part:

"* * * *

"2. When a plea of not guilty is entered at an arraignment the trial shall commence within one hundred eighty days of arraignment.

"3. The following periods of delay shall be excluded in computing the time within which the arraignment or trial of any such offense must commence:

* * * * * *

"(1) (d) Delay resulting from a change of venue;

* * * * * *

"5. If a defendant is not brought to arraignment or trial within the time limit required by this section, the trial judge may dismiss the information or indictment upon motion by the defendant and a showing by defendant that the failure to have the trial commence within time limits specified herein was occasioned by the state. * * *"

On this record, the trial court's ruling has not been shown to have been erroneous. The transcript here shows only the indictment, returned by the Clay County Grand Jury December 19, 1978, followed by defendant's motion to dismiss filed June 25, 1979. The transcript has no record of the

obviously granted change of venue to Platte County where the case was tried. The record of the arraignment is not in the transcript. Assuming that the allegation of defendant's motion was sufficient to fix that date, the burden remained with the defendant to show that the delay was occasioned by the state. In asserting that the defendant had not filed any pretrial motions which might have delayed the cause, defendant made no reference to the change of venue. Inasmuch as the statute expressly recognizes that a delay caused by a change of venue shall not be included in computing the time within which the trial was required to begin, the defendant at least had the burden of demonstrating that the change of venue which he took was not the cause of the delay. A bare assertion by counsel that it was not will not suffice. The defendant failed to sustain his burden of showing that the delay was attributable to the state and the trial court did not err in overruling the motion.

■ Appellant complains that the trial court took "adversarial action" prejudicial to defendant in the following situation: A chemist called by the state testified that in his opinion swabs from the vaginal and rectal areas of the victim contained human spermatozoa. The witness was then cross-examined. At the conclusion of the cross-examination, the trial court, out of the hearing of the jury, suggested that the prosecutor have the witness explain the significance of the presence of spermatozoa. The court asked defense counsel whether they had any objections to such inquiry and counsel said: "Just so he doesn't lead the witness." The prosecutor then elicited from the witness, without objection, that the finding of spermatozoa indicated recent sexual intercourse.

Here, appellant, in view of the lack of objection at the trial, advances his claim as one for application of the plain error rule. Rule 29.12(b). He contends that the trial court's action placed the judge in an adversarial role and the trial counsel was placed in the position of either objecting to the evidence and drawing the matter to the jury's attention when his objection would certainly have been overruled, the trial court having suggested the inquiry, or of remaining mute and not giving further emphasis to the testimony by objecting.

This hypothesis is not sustainable on this record. The trial court brought up the subject out of the presence of the jury and provided an opportunity to object. Trial counsel, different from counsel on appeal, rejected the opportunity. Undoubtedly trial counsel was well aware of what the witness's answer to the inquiry would be and could have posed an objection out of the presence of the jury had he felt one was warranted. The circumstances do not call for application of the plain error rule.

The cases of *State v. Haddix*, 566 S.W.2d 266, 272–274[2–6] (Mo.App.1978), and *State v. Embry*, 530 S.W.2d 401 (Mo.App.1975), involved comments and inquiries by the trial judge in the presence of the jury. The court's remarks in those cases were held error because of the possibility that the remarks would indicate to the jury the court's opinion that the defendant was guilty. *Embry* was reviewed under the plain error rule on the theory that the remarks of the court denied the defendant a fair and impartial trial. 530 S.W.2d 404[3].

■ However, a trial court's remarks or suggestions outside of the presence of the jury do not have such effect. See *State v. Johnson*, 454 S.W.2d 27, 29–30[4–6] (Mo. 1970); *State v. Preston*, 583 S.W.2d 577, 583–584[11] (Mo.App.1979). In this case, the colloquy outside the presence of the jury could hardly have conveyed to the jury any impression regarding the trial court's ruling and the incident did not affect the defendant's right to a fair trial.

■ Appellant complains of the trial court's overruling his objections to testimony of Floyd W. C. Newberry and Strickland to statements attributed by them to White. The testimony was objected to as hearsay and the objections overruled on the theory that the statements of a coconspirator were admissible as an exception to the hearsay rule. Appellant argues that the statements

attributed to White about the killing of Roxanne were made following the carrying out of the conspiracy for that purpose and could not be used against an alleged coconspirator. See *State v. Newell*, 462 S.W.2d 794, 796[1] (Mo.1971). The state does not question the rule relied upon but contends that the conspiracy involved was one to collect insurance by reason of Roxanne's death and that the conspiracy for that purpose was still operative at the time of the questioned statements.

The complained of conversation between the father and White occurred almost immediately after the carrying out of the conspiratorial objective. As such, the conversation "characterize[d] the action of the parties as res gestae of the crime charged." 16 Am.Jur.2d Conspiracy, § 48, pp. 266–267 (1979). See *United States v. Cox*, 449 F.2d 679, 688[3] (10th Cir., 1971) cert. den. 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972). *State v. Hayes*, 249 S.W. 49 (Mo. 1923), is distinguishable in that the conversation there involved and held not part of the res gestae and inadmissible because it occurred following the carrying out of the object of the conspiracy did not occur immediately following the criminal act.

 Appellant raises constitutional objections to the testimony of Floyd W. C. Newberry and Strickland, contending that the use of their testimony as to White's statement denied appellant's right to confront witnesses against him, in violation of federal and state constitutional guaranties. The testimony regarding White's statements was admissible under well-established, recognized exceptions to the hearsay rule. As such their use did not deprive appellant of the right to confront witnesses against him. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Delaney v. United States*, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462 (1924); *Ohio v. Roberts*, —— U.S. ——, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

Appellant relies upon cases involving the use of post-arrest statements by a coconspirator or codefendant. *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *State v. Rayner*, 549 S.W.2d 128 (Mo.App.1977), cited by appellant, dealt with a different situation and are not here applicable.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.