STATE of Missouri, Respondent,

v.

Theodore Anthony DUISEN, Appellant.

No. 52446.

Supreme Court of Missouri,
In Banc.

July 10, 1967.

Rehearing Denied Aug. 3, 1967.
Certiorari Denied March 4, 1968.
See 88 S.Ct. 1063.

Norman H. Anderson, Atty. Gen., Jefferson City, James P. Jouras, Special Asst. Atty. Gen., Kansas City, for respondent.

Theodore F. Schwartz, Clayton, for appellant.

EAGER, Judge.

Defendant was convicted by a jury of first degree murder and sentenced to death. He has been effectively represented by counsel both at the trial and in this Court. All points raised on this appeal were covered in a motion for new trial. No question is raised on the sufficiency of the evidence, but certain assignments require us to state the evidence in some detail. The primary, and in fact only, defense was that of mental disease or defect, under § 552.-030, RSMo, V.A.M.S., Laws 1963, p. 676; however, defendant and his counsel have not at any time admitted the crime or any of its elements. He did not testify.

On June 19, 1964, a body was found floating in the Meramec River in St. Louis County; the fire department was notified and the body was removed. The clothing consisted of a man's brown-checked sport shirt and a pair of levis or blue jeans. There was no hair on the head. Photographs were taken which will be referred to later. There were no labels on the clothing. The deputy coroner viewed the body and it was removed to the county morgue, where an autopsy was performed. On June 22 Dr. Wilcox, a dentist, also examined the body. The pathologist, Dr. Tucker, ascertained that the body was that of a young woman, noted her height and approximate weight, and testified further: that her head and her pubic region had been shaved of all hair a short time before her death, and that the body was decomposed, but the organs were intact; that no marks of violence were visible, that she had not been drowned, that no poison was present in the stomach contents, that she was not pregnant, but that he was not able to determine the exact cause of death. He stated as his opinion, however, that she had been strangled and testified that in some such cases there are no marks left on the neck; he found no evidence of a natural cause of death, after having examined the various organs and the brain. Dr. Wilcox, the dentist, testified that the teeth shown in a photograph of the mouth of this body, Exhibit No. 9, were "very similar" to those shown in a photograph of Patricia Sutterfield (for whose death defendant is charged) and that they were in excellent condition. The body was retained by the county authorities until July 8, 1964, when, not having been identified or claimed, it was disposed of under §§ 194.120–194.180, RSMo 1959, V.A.M.S.

Of the photographs taken at and around the scene where the body was found the only ones material here are Exhibits 9, 4, 5 and 6. No. 9 merely shows the mouth and teeth in a very hazy photograph of a face; Exhibits 4, 5 and 6 show a body, prone in two photographs and in a sitting or leaning position on the bank of a stream in the other; the body is clothed in a shirt and trousers, is apparently somewhat bloated and decomposed, and the head appears to be entirely devoid of hair. At the trial Gerald Lee Sutterfield, husband of Patricia, identified Exhibit No. 11 as a photograph of his wife Patricia while alive; he also examined Exhibits No. 4, 5 and 6; concerning Exhibit 6, he stated that he believed the body to be that of his wife based largely on body structure; as to Exhibits 4 and 5, he stated that they showed a "strong resemblance of my wife"; he further testified, after describing his wife's teeth generally, that the facial photograph of the body, Exhibit 9, was, he believed, a picture of his wife, and in that connection he also referred to Exhibit 11, the life photograph of her taken by "her family." Objections were made to Exhibits 4, 5, 6 and 9, as referred to later, but no objection to Exhibit

9 is raised on this appeal. They were admitted and shown to the jury.

Sutterfield, an automobile mechanic, had been married to Patricia for about two years, although she was apparently only 17 years old at the time of her disappearance. They lived at 2843 Russell in the City of St. Louis and she had, supposedly, been attending the Martin Training Institute in downtown St. Louis. They had no children. When her husband came home from work at about 9:30 or 10:00 p.m. on May 24 or 25, 1964, she was not there, and he never saw her again. He reported the disappearance to the police on the next evening with such information as he could give, made inquiries of relatives, and made sundry trips out of town in an effort to locate her. He told the police that he thought she might be with a "James Castle," a man 22 or 23 years of age who had been a filling station attendant in the neighborhood and who lived nearby; also, that she was last seen in a white, 1961 Chevrolet carrying a California license plate. Sutterfield had met "James Castle" once; he next saw the man at the trial where he appeared as James Buddy Clubb, Jr., and testified as such.

The transcript does not disclose the steps taken to unravel this mystery, but we may assume that the activities of "Castle" were a focal point. Defendant Duisen made various oral statements to the police and to the chief trial assistant of the Circuit Attorney. The Court held a hearing concerning these statements outside the presence of the jury and found in detail that the statements were voluntarily made. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. No point whatever is made here on the admission of those statements, and we therefore consider the facts so disclosed, with the testimony of Clubb, in our continuing narrative of the evidence.

From this evidence the jury could reasonably have found the following: that "James Castle," actually Clubb, met Patricia Sutterfield in the neighborhood where she lived, had several dates with her and had sexual intercourse with her; that he introduced her to the defendant, Theodore Anthony Duisen, who induced her "to go into the prostitution business for him" and rented an apartment in the 4500 block on Forest Park; that she did so operate "for him" for probably a month or less; that defendant's wife became "jealous" and that Patricia, so defendant thought, was also causing trouble between defendant and Clubb by things she told to each separately; further, that defendant was afraid that she might talk concerning a "prior event" which she had witnessed, and that "in order to keep her quiet he killed her"; that defendant identified Exhibit No. 11 (the life photograph) as a picture of the girl he killed. [The "prior event" was considered by the Court outside the presence of the jury, and properly so, for there was testimony that Patricia and others had witnessed the drowning by defendant in the Mississippi River of another girl who had declined to enter the business of prostitution for him.] Continuing with the facts of which there was substantial testimony, it was shown: that on or about June 15, 1964, Patricia was in a house rented by defendant's wife and located at 6222 Clayton *in the City of St. Louis;* that Clubb and defendant's wife were present; that then and there defendant "slapped her around" in the living room of the house, then took her (Patricia) into the bathroom and shaved or clipped (with an electric razor or clippers) all the hair off her head, her pubic area, and her eyebrows; that he then ordered her to take a bath, and gave her a sport shirt and a pair of blue jeans from which the labels had been removed; that when she came out, he slapped her around some more, threw her down on the floor on her back, leaned over her and choked her until his thumbs became numb; that she then appeared to be dead and he raised her head up and slapped her; that he said "If she is not dead now, I am going to make sure," whereupon he got a wire extension cord, wrapped it around her neck, put a foot on one end and pulled as "hard as he could" on the other; that there were then no signs of life in the girl. We interject here that defendant, in his statements, said that after

choking the girl for a while, but before using the extension cord, he tried to revive her by mouth to mouth resuscitation but Clubb recalled no such efforts. The evidence further showed: that it was still daylight when all this occurred; that after dark Clubb helped defendant carry the body to defendant's car, that they placed it in the trunk, and thus transported it to the bank of the Meramec River at "Long Beach" where they threw her in, the body being clothed in the shirt and jeans which defendant had furnished; that soon thereafter Clubb and defendant drove to California for a while in Clubb's 1961 Chevrolet; that defendant used narcotics but Clubb did not know whether he was under the influence of such at the time of the killing; that defendant was then armed with a loaded .38 caliber revolver; that he looked and acted "mad" and "cussed" during the proceedings, started "raving," and said "I got to get rid of the body." At the time of trial Clubb was under indictment for the murder, had consulted with his counsel and the Circuit Attorney's office, and had been advised of his constitutional rights. He testified that he protested to defendant, telling him that it made no sense to kill the girl, but without avail.

Defendant did not testify and there were no admissions made at the trial which lessened the State's burden on the evidence; in his final argument to the jury defendant's counsel said: "There is not much doubt about the facts, there is not much doubt that everything you heard was probably pretty substantially right. There is no question about that." The statement made at that time relieved the State of nothing. The defense, as already indicated, was "mental disease or defect" under § 552.030, Laws 1963. The record does *not* show compliance with subsection 2 of that section, requiring a plea of "not guilty by reason of mental disease or defect * * *," but since the trial revolved about that defense, evidence was received thereon, and the jury fully instructed on that issue, we pass the point, though somewhat reluctantly. Conceivably, some of the objections and assignments now made could well be ruled ineffective. Counsel who intend to rely on that statute should comply with it.

The defendant was examined three times by psychiatrists, twice on motion of the defendant and once on motion of the State. It will not be necessary to relate this medical testimony in any detail. Dr. Joseph Shuman had talked with defendant twice and expressed the opinion that he was mentally ill, with a schizophrenic reaction of the paranoid type; he further testified, by reading from his report without explanation, that defendant had "a mental defect which prevents him from conforming his conduct to the requirement of the law," in addition to anti-social behavior. In rebuttal the State produced Dr. Earl C. Kepler, psychiatrist at the Fulton State Hospital for 13 years, and Dr. James N. Haddock, a psychiatrist and physician practicing in St. Louis; Dr. Haddock had examined defendant three times, and Dr. Kepler, with other staff members, had seen and examined him at various times over an extended period of observation at the hospital from July 28 to September 7, 1965; defendant had been sent there for a mental evaluation. Dr. Kepler testified: that defendant did not have any mental disease or defect, and that he did have capacity to appreciate the character and nature of his conduct; that he had a sociopathic personality, of the anti-social type. (See § 552.010.) Dr. Haddock testified to the same effect; both gave various reasons for their opinions and stated their findings. The issue of the existence of a mental illness or defect of such character as to exonerate defendant from responsibility was fully submitted to the jury in Instruction No. 3 and the jury found against defendant on the issue. The verdict was: "We, the jury in the above entitled cause, find the defendant guilty of Murder first degree as charged in the indictment and assess his punishment at death."

The first point briefed is the alleged error in the admission of the photographic Exhibits 4, 5 and 6 already discussed, and also Exhibits 3, 7 and 8. Number 3 merely

shows a body floating at some distance away and is of no significance; No. 7 and No. 8 are photographs of the rear of a house and of a rather dilapidated boat house, respectively, and require no further consideration. We confine ourselves to Exhibits 4, 5 and 6. The objections made at the trial and renewed here are that these were inflammatory, prejudicial, and of no materiality on any issue in the case; also, counsel says here that any probative value which the pictures might have had was far outweighed by their inflammatory and prejudicial effect, and that they should have been excluded. Counsel cites State v. Floyd, Mo., 360 S.W.2d 630, and State v. Robinson, Mo., 328 S.W.2d 667. In Floyd, the photograph admitted was of the body of a young girl, very badly decomposed, and of no value for identification purposes; this was said by the Court to be "obscene, offensive * * * and repulsive." Its admission was held to have been error. The defense there specifically *admitted* the identity of the body shown in the photograph, and the body had also been identified by a watch, a bracelet, the shoes, and the dress. The Court recognized that such exhibits, though "gruesome," are generally admissible in the discretion of the trial court if they are of probative value, and that a tendency to prove identity is one of the grounds upon which they are frequently admitted; the Court also recognized that occasionally the probative value of such an exhibit may be outweighed by its "manifestly inflammatory" nature to such an extent that it should be excluded. In Floyd, no relevancy whatever was demonstrated. The conviction in State v. Robinson was reversed for the failure to give a proffered instruction on self-defense, but the Court also noted that photographic exhibits which it stated were "obscene, offensive, vulgar, horrid and repulsive" should not have been admitted. There the Court further said that the defense "admitted every fact which may have been proved by the pictures." We hold that those cases are distinguishable.

■ Here, defendant admitted nothing, and put the State strictly to its proof. In State v. Morris, Mo., 248 S.W.2d 847, the Court discussed a very similar situation. Our review of the evidence shows that the exhibits were used to a substantial extent on the issue of identity; they were also material in that they corroborated the oral statements of the defendant himself and the testimony of Clubb, particularly as to the shaving off of all the hair, and the putting of defendant's clothes on the girl. State v. Moore, Mo., 303 S.W.2d 60, loc. cit. 65–66. This body had never been officially identified prior to trial, so far as the transcript shows. The exhibits were of some value also in establishing the corpus delicti of the crime. See, State v. Francies, Mo., 295 S.W.2d 8, 12; State v. King, 342 Mo. 1067, 119 S.W.2d 322. Even in his motion for a new trial defendant still contended that this element had not been established. We hold, on the authority of such cases as State v. Perkins, Mo., 382 S.W.2d 701, State v. Moore, Mo., 303 S.W.2d 60, State v. Brown, Mo., 312 S.W.2d 818, State v. Morris, Mo., 248 S.W.2d 847, State v. Tyson, 363 Mo. 1242, 258 S.W.2d 651, State v. Laspy, Mo., 298 S.W.2d 357, and State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185, that there was no error in the admission of these exhibits. They were of probative value and, moreover, it is difficult to imagine how any such photographs could conceivably have "inflamed" the minds of the jury beyond the point to which they were otherwise inflamed by the uncontroverted evidence of these utterly revolting acts of the defendant. As stated by the Court in Moore, supra, at 303 S.W.2d loc. cit. 66: "If the photographic views are shocking and horrible it is because the crime is one of that sort, whether described in words or pictures. Some phases of the oral testimony are as likely to cause agitation as the pictures." The trial court here gave the most careful consideration to the admission of these exhibits; it excluded one (or caused the State to withdraw it) which, judging from the context, showed the pubic area of the body. We hold that the Court's discretion was properly exercised as to all of the exhibits and that there was no error.

■ We shall next consider Instruction No. 3, to which three separate complaints are addressed in defendant's brief. At the expense of prolixity we find it necessary to quote the instruction in full, as follows:

"In this case, a defense is presented that defendant is not guilty by reason of a mental disease or defect excluding responsibility. This defense, when established, is one which the law recognizes, and if the jury finds that it has been proved by the evidence in this case, it would be the duty of the jury in such event to acquit the defendant altogether.

"The phrase 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. With that exception the phrase means and includes any mental disease or defect, regardless of its medical label or source, whether it was present at birth or developed later as a result of injury or physical or mental disease, or whether it is capable of improving or deteriorating. In determining whether or not the defendant had such a mental disease or defect at the time of the offense charged against him, the jury may take into consideration all of the facts, circumstances and testimony of lay and expert witnesses given in evidence. However, it is for the jury alone to say in its verdict whether or not the defendant had such a mental disease at the time of the offense charged against him and whether or not as a result thereof he did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law.

"With reference to the issue of whether or not the defendant is not guilty by reason of such a mental disease or defect excluding responsibility, you are instructed that the law presumes that the defendant at the time of the conduct charged against him was free of such a mental disease, and the burden rests upon the defendant to prove otherwise by a preponderance or greater weight of the evidence.

"The presumption of freedom from such a mental condition as would relieve the defendant of responsibility for the conduct charged against him continues throughout this entire case and may be considered by you along with all facts and circumstances in evidence in deciding the issue now being submitted to you.

"Therefore, you are instructed that even if you find and believe beyond a reasonable doubt that the defendant did with his hands choke, strangle and suffocate Patricia Sutterfield, with great force and violence, and thereby caused her death as submitted in Instruction No. 2, nevertheless if you further find and believe by a preponderance or greater weight of all facts and circumstances in evidence that the defendant had a mental disease or defect at that time, and that as a result thereof he did not know or appreciate the nature, quality or wrongfulness of his conduct, or he was incapable of conforming his conduct to the requirements of law, then it would be your duty to return a verdict of 'Not Guilty By Reason of Mental Disease or Defect Excluding Responsibility.' "

The first complaint is that (near the end of the second paragraph) the instruction omitted the word "defect" in a vital part, and that this was not cured by other references thereto because the sentence in question referred to what the jury should say "in its verdict." We have considered the instruction in considerable detail and as a whole. It contains the word "defect" six times; it omitted it twice. The second omission, in the third paragraph which referred to the presumption of freedom from mental disease, would be favorable to the defendant, and he does not complain of that. There was really no distinction made in the medical evidence between mental disease and mental defect, nor was either term actually defined. Defendant's psychiatrist stated that he found *both*, but he elaborated no further, except to give various symptoms of

schizophrenia. As we said in State v. Garrett, Mo., 391 S.W.2d 235, at loc. cit. 239: "The statute, § 552.030, uses the term 'mental disease or defect' in a generalized sense which, as we understand, merely means a mind sufficiently disordered to cause the results indicated (with the specific exceptions noted). The term was not intended to designate any specific form or forms or medical classifications of mental disease." In view of the instruction as a whole, and particularly the last paragraph, the jury could not conceivably have been misled by this purely technical omission and, after all, that is the test of prejudicial error. State v. Spidle, 342 Mo. 571, 116 S.W.2d 96; State v. Fitzgerald, Mo., 174 S.W.2d 211; State v. Roseberry, Mo.App. 283 S.W.2d 652; State v. Harris, 357 Mo. 1119, 212 S.W.2d 426.

■ Counsel next contends that the Court erred in giving that part of the instruction contained in its third paragraph to the effect that the law presumes a freedom from mental disease. The only complaint made is that the State did not request such an instruction and the Court had no right to give it of its own motion. There is no merit whatever in the contention. The presumption is established as the law of such cases by the very wording of the statute, § 552.030(6), the burden of proof is fixed, and it is specifically provided that the presumption "shall not disappear." Counsel seizes upon the words that the jury *shall* be so instructed "when requested by the state." In our view this mandatory requirement does not limit the right of the Court, in declaring the law of the case, to so instruct on its own motion; indeed, in the context of that part of the statute, including the requirement on the burden of proof, it would seem that the Court could hardly cover the subject without including this element.

■ Counsel also complains of the use of the word "established" in the first paragraph of the instruction, saying that this cast a greater burden on defendant than the law requires. We note again that the statute very specifically places the *burden* of proving mental disease or defect on defendant, when he thereby seeks exoneration. Counsel cites: State v. Luttrell, Mo., 366 S.W.2d 453, State v. Forsythe, Mo., 251 S.W.2d 17, State v. Davis, 342 Mo. 594, 116 S.W.2d 110, and State v. Robinson, Mo., 255 S.W.2d 798. It will be impossible to develop here the facts and the specific holdings of each of those cases; the basic distinction is that all of them involved *self-defense*, on which the defendant *does not* have an affirmative *burden*, as he specifically does on mental disease or defect. When a substantial issue is raised on self-defense, the Court must instruct upon it, and the State still has the burden under *all* the evidence of proving the defendant to be guilty beyond a reasonable doubt. Generally speaking, the Court held in those cases that the instructions complained of tended to *reverse* the burden of proof and were thus misleading. The discussion of the word "established" in State v. Davis, supra, must be considered in the context of the facts and of the particular instruction involved; in essence, it only held that the instruction tended to shift the burden improperly to the defendant on the issue of self-defense. The differentiation sought to be made there between the requirements created by the word "established" and the term "preponderance of the evidence," would seem to have been wholly unnecessary for, in fact, the defendant had *no burden* on the issue of self-defense. In our case the jury was not left, as counsel suggests, to "whatever meaning" it chose to give to the word. Even a casual reading of the instruction discloses that both in the third paragraph and the last paragraph of the instruction the jury was told specifically that the defendant's required degree of proof was by a preponderance of the evidence. The burden of proof was not altered or increased here by the use of the term "established," and the contention is denied.

■ Defendant further complains, in a separate point, of Instruction No. 4, in

which the jury was told that if it found that defendant had made any *voluntary* statement or statements, then it "should consider such statement or statements altogether and in the light of the circumstances under which they were made, * * *," with a further limitation depending upon the existence of a "mental disease or defect" at the time. The complaint now made is that the instruction did not specifically require the jury to find that such statements "were true and correct." In the first case cited, State v. Cross, Mo., 357 S.W.2d 125, the defendant had denied the truth of the statements attributed to him and the instruction told the jury, in effect, that if defendant had voluntarily made a statement it was, as a matter of law, evidence against him because "common experience proves that a man will not without motive for so doing, confess facts to his disadvantage, unless they are true." The instruction was held erroneous as an argumentative comment on the evidence and for telling the jury as a matter of law that defendant's confession was to be accepted as true. State v. Phillips, Mo., 299 S.W.2d 431, is substantially to the same effect, holding erroneous an instruction that what defendant had said "against himself" was presumed to be true. In State v. McCollum, Mo., 377 S.W.2d 379, an instruction seemingly almost identical to our Instruction No. 4 (except for the limitation of mental disease or defect) was approved, although the objection there made was not the same as ours. In State v. Adams, Mo., 380 S.W.2d 362, the Court approved a rather similar instruction, the complaint being that it told the jury that the confession, if voluntary, "must be accepted as true," although at trial defendant had denied it. There the Court said, loc. cit. 370: "The first paragraph of the instruction very plainly tells the jury that *if* the confession was found to be voluntary, it should be given 'such probative value as evidence as you believe it deserves.' The instruction is not subject to any such construction as is now sought, and the contention is wholly without merit." We see no substantial difference between that instruction and one telling the jury that it should "consider such statement or statements altogether and in the light of the circumstances * * *." The jury was not told here that any statements were presumed to be true, nor were the statements in anywise controverted. Since there was actually no issue on voluntariness, as such, this instruction was given primarily for the purpose of submitting to the jury the issue of defendant's mental condition at the time of making the statements. The statements, as offered and received, merely became a part of the total evidence; we hold that this instruction, especially when considered with the general credibility instruction, did not limit the right of the jury to find the statements to be true or untrue and act accordingly. The point is denied.

An assignment is made of supposed error in the giving of Instruction No. 5; this told the jury that if it found the existence of a mental disease or defect at the time of the offense "not sufficient to render him (defendant) not guilty by reason thereof," it might still consider the evidence of such "for the purpose of determining" his punishment, i.e., death or life imprisonment. The statute specifically provides that evidence "that the defendant did or did not suffer from a mental disease or defect" shall be admissible for that purpose, § 552.030, subd. 3(2), in case of a capital offense. It is a little difficult to understand the argument that this instruction "vitiates" the defense of *not guilty* by reason of mental disease or defect; defendant had already been given the full benefit of that defense by Instruction No. 3. Instruction No. 5 merely gave him the additional benefit of having the jury consider his mental condition in assessing punishment. The statute *so requires*. Counsel says that the statute fixes no standards and gives no guide to the jury as to the quantum of mental disease or defect required for a not guilty verdict, and that the jury may thus find the existence of a mental disease or defect and still find defendant guilty of murder,—relegating the matter to guesswork. No constitutional attack has been

made upon the statute. It is so worded that obviously the jury must first find whether there was such "mental disease or defect" as would cause defendant not to "know or appreciate the nature, quality or wrongfulness of his conduct" or to be "incapable of conforming his conduct to the requirements of the law." Subsection 3 provides that evidence that defendant did or did not suffer from a mental disease or defect shall be admissible for that purpose, "*or*" for the purpose of determining the punishment in a capital offense. Counsel emphasizes the words "or did not suffer" as apparently significant, and argues that the instruction should not have been given under this evidence. It is obvious that a finding that defendant was wholly sane would not aid him, if found guilty, in achieving a mitigation of the punishment. We rule that evidence pro and con may be considered by the jury for the specified purposes, after the jury has determined that defendant is guilty; upon its face the instruction was of definite benefit to him. The legislature could hardly express in words or figures the exact quantum of proof necessary for full exoneration, or that which would be sufficient to relieve a defendant of the death penalty, if guilty. The Court followed the injunction of the statute in giving the instruction and there was no error. The further suggestion that the instruction should have told the jury that it was applicable only if it found defendant guilty of a "capital offense" does not merit serious consideration. No jury could have been so obtuse as not to realize that this was a capital offense, and it obviously found the defendant guilty before assessing the punishment.

The last point made concerns a communication in writing sent by the Court to the jury in answer to an inquiry made by it, after it had retired to consider its verdict. The questions were: "What is the court's definition of imprisonment in the penitentiary during the remainder of his natural life? Also, is parole possible? Signed Forrest W. Darr." The Court discussed the matter with defense counsel and advised the latter of his proposed answer. Counsel stated: "For the purpose of the record, the defendant will object to any communication by way of answering questions of the jury." The objection was overruled and the following answer was sent to the jury: "The first question above needs no answer, because the words are simple and need no defining. The second question is not a matter of proper concern by the jury." We note here that no specific objection was made to the contents of the answer, although counsel was fully advised thereof.

Defendant cites State v. McGee, Mo., 234 S.W.2d 587, and State v. Shipman, 354 Mo. 265, 189 S.W.2d 273, which are concededly not directly in point. In McGee the extensive, oral answers made by the Court were participated in by counsel; the questions were substantially similar to those asked here. In Shipman, defense counsel consented that the Court answer an inquiry concerning parole, and also made suggestions as to the form of the answer. In neither case was error found, under those circumstances. The argument of defendant here is that the jury was "misled" into thinking that defendant could readily be paroled if given a life term for, he says, the jury then returned its verdict within a short time.

■ We do not consider that this answer of the Court was an instruction on the law which is required to be in writing. McGee, supra; State v. Baugh, Mo., 382 S.W.2d 608. In its real substance, this answer merely referred the jury to the instructions already given, neither adding to nor detracting therefrom. For a somewhat similar situation where a more extensive answer was held merely to have had that effect, see Baugh, supra. Here counsel suggested nothing different or additional and made *no* specific objection; common courtesy required the Court to make some answer. We hold that there was nothing objectionable or improper in the answer and that the jury was not misled to defendant's prejudice.

Having considered all assigned points of defendant's brief, we further find no error in those parts of the record which we examine under Rule 28.02, V.A.M.R. without assignment. The defendant had a fair trial before an able judge, and he had the assistance of highly competent counsel both at the trial and since. The judgment is affirmed.

Date of execution set for Friday, August 25, 1967.

All concur except SEILER, J., who dissents.