STATE of Missouri, Respondent,

v.

Ransom McNeil JACKSON, Appellant.

No. 56714.

Supreme Court of Missouri,
Division No. 2.

Oct. 8, 1973.

John C. Danforth, Atty. Gen., Karen I. Harper, Asst. Atty. Gen., Jefferson City, for respondent.

Bell, Wilson, Fullwood & Harris by James A. Bell, St. Louis, for appellant.

HENRY I. EAGER, Special Commissioner.

This is an appeal from a conviction for first degree murder and a life sentence. The notice of appeal was filed prior to January 1, 1972, and we have jurisdiction. No point is made concerning the sufficiency of the evidence for submission, and we need not state the facts in great detail.

On May 1, 1970, at about 10:30 p. m., several Negro youths were seen dragging a young Negro female up (or down) an alley in the vicinity of St. Vincent and Nebraska Streets in the City of St. Louis. She was ultimately dragged out of that branch of the alley, across Nebraska Street and into the alley on the other side. There were at least three of these youths. Two of them held the girl's arms and pulled her and, for at least part of the time, one, identified as this defendant, walked near her feet and kept a lookout, peering from side to side. The girl was beaten about the face and head, her clothing was torn into pieces and scattered, and she was almost naked; she struggled constantly to free herself, and screamed. Several of the witnesses heard her scream "Andre, leave me alone. I won't tell." Various witnesses testified that this defendant was generally known as "Andre" and was called and spoken to by that name. All of the girl's possessions were taken from her and stolen or scattered in the alley. Defendant was identified as a participant by at least five of the witnesses; two saw him beat the girl with his fists. In the final stages of the assault the girl "almost" got away, but defendant grabbed her and pulled her back; he then drew a pistol, held it close to the back of her head and shot her. Two of the witnesses saw this and testified specifically to it; one of them was only a few feet away. Various others heard the shot. Defendant then ran away down the alley. The girl died very shortly from the gunshot wound.

The girl was one Dorothy Lashly. The cause of death was confirmed by autopsy. Defendant did not testify at the trial. Two of his relatives testified that he was at home on the evening in question, supposedly at the time of the crime. Most of the State's witnesses lived in the neighborhood and knew the defendant, either personally or by sight, from rather frequent observations.

A pre-trial hearing was held on defendant's motion to suppress his oral confession. The substance of defendant's testimony there was: that he was 18 years old, 17 on May 1, 1970; that he was first arrested on May 6, and that without any explanation of his rights, but with the advice that if he could not afford a lawyer "they" would provide one for him, he was interrogated that night for three hours and again the next morning for an extended period, and released a little later; (his testimony did not show specifically what that interrogation concerned but he did testify he was told that if he told what happened on the night of May 1 he would be "set free"; no statements made by the defendant at that time are involved here). He was arrested again on the evening of May 11 at his home, taken to police headquarters, and booked. He testified: that his "rights" were not explained to him then nor was the Miranda card read; that he was told he had a right to a lawyer, but he "didn't think he needed one," and did not request one; (after some minor contradiction on this point the above was substantially confirmed); that he asked to see his aunt; that he was interrogated that night for two and one-half hours and again the next morning for an extended period; that he was threatened with beating "in a way * * * the usual things"; that he had been arrested before and had "heard these warnings," and that he has had his "rights" explained to him; that on a previous conviction he had served 90 days; that on this occasion he answered questions but did not say that he shot the girl.

The police detective who wrote the statements of defendant on May 11, 1970, testified at the pre-trial hearing that defendant was then advised of his constitutional rights by Sgt. Dwyer who read each one from the official card and asked defendant, after each separate one, if he understood it; that as to each, defendant answered that he did; that he was asked if he wanted an attorney to which he answered he did not; that no one threatened him in any way, mentally or physically, and no one promised him he could go free if he answered the questions; that the interrogation took perhaps 45 minutes and that there was none the next morning; that on the next morning defendant was placed in a showup at which time he declined to make further statements. The only statements offered in evidence were those taken on the evening of May 11.

After hearing the evidence the Court ruled the matter in an oral opinion, as follows: "Let the record in this case show that the Court has been presented with a motion to suppress an alleged oral confession. In support of that motion the defendant himself took the stand and testified. This Court heard this defendant admit that he is a ninth grade graduate, that he went as far as the ninth grade in school. This Court interprets that to be one year of high school. This Court further understood this defendant and felt that he was quite articulate in his manner of testimony, that he had currently a background of confrontation with the police where on prior occasions he was given the alleged constitutional warnings, that he had so indicated his knowledge of his constitutional rights by indicating that on prior occasions he was advised that he had a right to have an attorney, that on a prior occasion he was advised of his right to remain silent. These are words and expressions that come from the defendant himself. The Court feels that he is knowledgeable as to police activity because he knew where he was; he knew that he was in the homicide Division, and so testified. On the other hand, the officer has indicated that while this oral confession was being obtained the so-called Miranda warnings or constitutional rights were given in his presence. The Court finds as a matter of fact that the defendant was advised of his constitutional rights, and as a conclusion of law the Court finds that the Miranda warnings were given in compliance with the constitutional rights, and the motion to strike the alleged oral confession will be overruled. * * * I want the record to show that the Court wants to add to his findings of fact and conclusions of law that the defendant had an intelligent and actual understanding of his warning rights and that he knew what he was doing and the fact that he may or may not remain— the fact he may remain moot and silent. The Court finds that he did affirmatively and knowledgeably waive his rights and he understood his rights."

At the trial two of the officers who were present at the interrogation on May 11 (there being others also) testified: that defendant was advised of his rights by reading from the official Miranda card (read again at the trial) and asked after each statement if he understood it; that as to each part he said that he did; that he further stated, after the advice, that he did not want a lawyer; that he said he would make a statement; that defendant stated, in answer to questions, that he and others had been drinking wine, that he and three others saw this girl walking on the street, that one of his companions went over and talked to her and then began struggling with her; that the other three, including defendant, ran over and began hitting the girl with their fists; that the struggle continued in the alley and across Nebraska to the other alley; that he, the defendant, drew a .22 caliber automatic pistol from his pocket and shot the girl one time in the head, holding the gun about six inches from her head; that he then ran and threw the gun into some "unknown location." The officers further testified that Officer Riley wrote the statement in long-

hand, and read it back to the defendant; that there were no promises, threats or coercion.

This evidence was heard by the jury and one of the instructions submitted to the jury the issue of the voluntariness of the confession. There was no evidence at the trial to contradict the testimony of the officers.

The defendant raises three points here: (1), and we quote: "That the court erred when it held a hearing on the confession and without ruling whether or not said confession was voluntarily given or not and ruled said confession to be admissible." (2) that a mistrial should have been granted when the Circuit Attorney, in argument, referred to the defendant as a "Dirty Murderer"; and (3) that it was prejudicial error to admit in evidence a photograph of the deceased girl lying in the morgue.

■ On the first point we note that the only contention is that the Court did not make a sufficient finding that the confession was voluntary before admitting it. Reliance is upon Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), and Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963). Escobedo and Shotwell are of no real relevance here. The teaching of Miranda is well known,—that a person in custody must be informed of his constitutional rights as there stated before he can be interrogated, if his statements are to have any validity. The holdings in Denno and Sims are to the effect that the trial court must first hold a hearing outside the presence of the jury on the voluntariness of a confession and must find it to be voluntary before it may be admitted in evidence, considering all the circumstances. In Sims,

the Court said 385 U.S. loc. cit. 544, 87 S. Ct. loc. cit. 643: "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." Primarily, the right being protected in these instances is that arising under the Fifth Amendment, as extended to the states under the Fourteenth Amendment. In Reck v. Pate, supra, it was indicated that the trial court should consider the physical and mental condition of defendant when deciding the issue of coercion. Such has also been noted in other cases.

More recently in Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) the Court said that the defendant was entitled to "a reliable and clear-cut determination that the confession was in fact voluntarily rendered," and that this may be found from a preponderance of the evidence. The latter point was the principal issue on appeal, but we do not note any express finding of the trial court that the confession was voluntary. The Court overruled the motion to suppress, noting certain testimony, and stated that it did not believe the testimony about defendant being beaten by the police. Apparently the general finding against the motion, coupled with the oral statement, were deemed sufficient as a finding of voluntariness. See also Hackathorn v. Decker, 369 F.2d 150 (5th Cir. 1966), where the Court held that the overruling of a motion to exclude the confession was a sufficient finding of voluntariness. And see also State of Texas v. Graves, 380 F.2d 676 (5th Cir. 1967).

There would seem to be no magic in the use of the word "voluntary," if the same meaning and intent are clearly expressed by other language in a finding of the trial court. We so hold. And see: State v. Stidham, 449 S.W.2d 634, loc. cit. 643 (Mo.1970). We have set out the oral opinion and findings verbatim. We note that the Court found: defendant was articulate in his testimony, that on prior occasions he had been given the constitutional warnings,

that in this instance he *was* advised of his constitutional rights, that defendant had an intelligent and actual understanding of his rights, knew what he was doing and knew that he might remain silent; also, that he affirmatively and knowledgeably waived his rights. The Court merely substituted its own language in place of the word "voluntary," but the meaning was and is the same. We hold that this was, in fact, a clear finding that the confession was voluntary, and that it would be hypertechnical to hold otherwise. Defendant's first point is denied.

The Court submitted the question of the voluntariness of the confession to the jury. No point is raised here on the fact that it did so, nor on the propriety of the instruction. Therefore, we do not discuss that submission, but we do note the concurring opinion of Judge Donnelly in State v. Bridges, 491 S.W.2d 543 (Mo.1973), suggesting that perhaps the issue should not be submitted to the jury at all, and that the practice should be reviewed by this Court when the question is properly presented. We do not consider that it is properly presented here.

■■■ Defendant's next point is that the Court should have granted his motion for a mistrial when the Assistant Circuit Attorney referred to the defendant in his argument as a "dirty murderer." The quoted phrase is not correct. What the attorney said was a "no-good murderer" and this was stated in a context substantially as follows: that the girl had struggled and fought as she was dragged, that they took her personal property, that she had done nothing wrong, that she had a right to live, and that she gave up that right to a "no-good murderer."

Defendant cites five cases, only one of which is later than 1895. Nothing would really be gained by discussing them in detail. They are State v. Fischer, 124 Mo. 460, 27 S.W. 1109 (1894); State v. Bobbst, 131 Mo. 328, 32 S.W. 1149 (1895); State v. Ulrich, 110 Mo. 350, 19 S.W. 656 (1892); State v. Young, 99 Mo. 666, 12 S.

W. 879 (1890), and State v. Dixon, 253 S. W. 746 (Mo.1923). They disapprove of such terms as "this infamous, lecherous scroundrel" (Bobbst), "low and contemptible brute, unworthy [of] the respect of the community" (Fischer); "sugar-loaved, squirrel-headed Dutchman" (Ulrich); "a mean, low down, wicked, dirty devil" (Young); and "some dirty, low-down hound and scoundrel like the defendant" (Dixon). The courts frown upon expressions of mere personal abuse unconnected with the evidence, and also upon personal opinions or beliefs of the prosecutor not formed from or justified by the evidence. However, a prosecutor may state an opinion or conclusion which he fairly draws from the evidence, as of defendant's guilt. State v. Feltrop, 343 S.W.2d 36 (Mo.1961); State v. Woods, 406 S.W.2d 593 (Mo. 1966); State v. Burchett, 302 S.W.2d 9 (Mo.1957); State v. Paglino, 319 S.W. 2d 613 (Mo.1958); State v. Moore, 428 S.W.2d 563 (Mo.1968); State v. Chester, 445 S.W.2d 393 (Mo.App.1969). And a belief of guilt may be stated where it is fairly apparent the opinion is based upon the evidence. Burchett, Woods, Feltrop, Paglino, Moore, supra. Here, if the jury believed the State's witnesses, defendant *was* a murderer, and the jury so found. It is apparent to us that the prosecutor was merely indicating a belief of guilt drawn directly from the State's evidence, and the addition of the term "no-good," while perhaps unnecessary, was also fairly justified by the evidence. The statement was assuredly one which the Court might permit in the exercise of the wide discretion vested in it on such matters. State v. Camper, 391 S.W.2d 926 (Mo.1965). And, the making of such a statement could add little, if anything, to the effect on the jury of the State's evidence showing the exaggerated criminal acts of the defendant. Under the circumstance the statement was not only permissible, but it was not prejudicial.

Defendant's last point asserts error on the admission of a photograph of the deceased girl taken in the morgue. The exhibit is not here, but the trial court de-

scribed it in some detail as follows: " * * * the photo shows the upper part of the body from the lower abdomen not including the private female organs off to the top of the head, and it shows one portion of a breast—it shows the right breast that is bared, and the other breast partially bared. It shows numerous marks and abrasions about the face." The objection was that the exhibit was inflammatory and that it did not "prove or disprove anything in this case * * *." The prosecutor explained the State's theory and position. Two of the witnesses saw the body in the morgue and identified the slain girl; one testified that her face was bruised and swollen. So far as this record shows there was nothing more inflammatory about this exhibit than there would be in almost any photograph of a dead body.

Defendant cites State v. Floyd, 360 S. W.2d 630 (Mo.1962), State v. Robinson, 328 S.W.2d 667 (Mo.1959), and State v. Pearson, 270 S.W. 347 (Mo.1925). In Floyd, the photo was held to prove nothing. In Robinson, the photo was apparently most obscene and offensive, and it was held it added nothing to the evidence. In Pearson, the complaint was of the waiving of bloody garments unnecessarily before the jury, a wholly different situation.

The trial courts have a wide discretion in determining the admissibility of photographs. State v. Stevens, 467 S.W.2d 10 (Mo.1971); State v. Crow, 486 S.W.2d 248 (Mo.1972); State v. Duisen, 428 S.W. 2d 169 (Mo.1967). It has generally been held that even though a photograph may be inflammatory it is admissible if it tends to prove any material element of the State's case; this includes the issues of identity, condition and location of the body, nature or location of wounds, and the cause of death; and, generally, if the photograph corroborates the oral testimony of the state or refutes defense testimony it is admissi-

ble. State v. Duisen, 428 S.W.2d 169 (Mo.1967); State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185 (1935); State v. Stevens, 467 S.W.2d 10 (Mo.1971); State v. Crow, 486 S.W.2d 248 (Mo.1972); State v. Clark, 494 S.W.2d 26 (Mo.1973). And a photo is not made inadmissible because the oral testimony may have described what is shown in the photo. Stevens, supra. In the above cases photographs much more inflammatory than the one here in question were held admissible; if the photo is relevant, it is not excluded because it may be inflammatory, unless the situation is so unusual that the extent of prejudice overrides the relevancy and probative value of the photo.

The photograph here tended to corroborate the State's witnesses concerning the beating of the girl about her head and face (actually a part of the res gestae), and it helped to establish her identity and the corpus delicti; it showed at least a portion of her wounds, the part which was preliminary to the fatal shot. We do not regard the photo as substantially inflammatory or prejudicial but, in any event, and as stated in Duisen, supra, it could not have inflamed the minds of the jury any more than they were "otherwise inflamed by the uncontroverted evidence of these utterly revolting acts of the defendant." There was no prejudicial error in the admission of this photograph.

Since we find no prejudicial error in any of defendant's points, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.