**STATE of Missouri, Respondent,**

v.

**Gary Andrew THOMAS, Appellant.**

**No. WD 42901.**

Missouri Court of Appeals, Western District.

Oct. 15, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 26, 1991.

Application to Transfer Denied Jan. 28, 1992.

---

Nancy A. McKerrow, Columbia, for appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

Before LOWENSTEIN, C.J., FENNER, P.J., and ULRICH, J.

FENNER, Presiding Judge.

Appellant, Gary Andrew Thomas, appeals his conviction of second degree murder, following jury trial. Punishment was assessed at life imprisonment.

The evidence, viewed in the light most favorable to the verdict, is recited as follows. On September 30, 1988, between 4:30 and 5:00 p.m., the victim, Roberta J. Mosher, was at her residence drinking alcoholic beverages with a friend. At about 8:30 p.m. that evening when Mosher's friend departed, Mosher appeared intoxicated and was having difficulty walking.

Later that evening, Mosher went to Tommy's Tavern. Appellant, Gary Andrew Thomas, an employee of the City of Independence, was also at Tommy's Tavern that evening. When Mosher arrived, she purchased a one-half pint bottle of liquor to go and then sat next to Thomas at the bar for the next hour or two, during which time Thomas purchased Mosher two or three drinks and visited with her.

As Thomas was ready to leave, he asked Mosher what type of beer she drank and he purchased a six-pack of Budweiser beer. Thomas and Mosher left the bar together, arm-in-arm.

At approximately 11:00 p.m., Richard Henderson and Judy Gentry left Tommy's Tavern. As they were approaching Henderson's truck, Thomas and Mosher stopped and spoke with them. Following the conversation, Thomas and Mosher continued up the street together past the Eagles Club. Thomas and Mosher were last seen standing by Thomas' vehicle; Thomas standing on the driver's side and Mosher on the passenger's side.

At approximately midnight, Thomas arrived at the home of a Scott Moffett. Thomas told Moffett that he thought he had "screwed up." He also told Moffett that he had picked up "this gal" at the bar, that "they had sex," that she pulled a gun on him and that he had hit her. Thomas asked if he could borrow a flashlight from Moffett. Moffett suggested to Thomas that the proper thing to do would be to call the police.

On October 12, 1988, Brian York was hunting when he discovered Mosher's body in an area known as Industrial Park where Independence city workers store gravel. The body was at the end of a gravel road about 45 to 50 feet below a cliff where York was standing. York and his parents then notified the authorities.

The victim's body was on her back and nude from the waist down. The body was in an advanced state of decomposition. On the back of the victim's head was a five inch diameter defect with nine separate skull fragments attached to the scalp. It was determined that the cause of death was a severe head injury.

On October 18, 1988, Thomas was contacted by the police as the investigation had produced information that the victim was last seen leaving Tommy's Tavern with him. Following waiver of his *Miranda*

rights, Thomas initially denied that he knew the victim, but later admitted that he knew the victim was the sister of another City of Independence employee. Thomas admitted that he had been at Tommy's Tavern on the evening of September 30, 1988, and that he had bought Mosher, the victim, a few drinks. He stated that Mosher had followed him when he left the bar, but that she had stopped in front of the Eagles' Club and he went to his vehicle. Thomas described the route he used in driving to Moffett's house, where he said he and Moffett drank beer for approximately four hours, after which he said he went home. Thomas initially denied driving his own personal vehicle in the area where the victim's body was found, but indicated he had been at the location in city vehicles. After being told that tire impressions were found at the location, Thomas acknowledged that he had been there in his own vehicle.

In a subsequent written statement, Thomas stated that he went to Tommy's Tavern on the night in question and while there the victim sat down next to him. He indicated that the victim sat with him for about fifteen minutes, that he bought a six-pack of beer and left, that the victim followed him when he left and that he last saw the victim by the Eagles' Club. Thomas denied that the victim was ever in his vehicle. Thomas stated that he went to Moffett's house where he stayed from about 10:30 p.m. until 2:00 or 2:30 a.m., that the two drank a six-pack of beer he had brought with him and then he went home.

A search of Thomas' vehicle disclosed no fingerprints, including those of Thomas, inside the vehicle. Head and pubic hairs found on the inside of the vehicle and in the trunk were indistinguishable from those taken from the body of Mosher. Head hair found on Mosher's pants was indistinguishable from a hair sample obtained from Thomas. Although no blood visible to the human eye was found on the interior of the vehicle, a luminal test done on the interior revealed "intense luminal stains," consistent with blood being present and the seat being washed.

A cast of a bootprint obtained from the scene was consistent with Thomas' bootheel in size, shape, general class characteristics and degree of wear.

Thomas testified in his own behalf and denied the offense. Following the guilty verdict and assessment of punishment, Thomas filed a Motion for New Trial which was denied. This appeal timely followed in which six points of error are alleged.

In point one, Thomas argues that the trial court erred in permitting the state to read Scott Moffett's written statement to the police, in admitting said statement into evidence while the jury was deliberating and in sending the statement to the jury. He argues that the repetition of Scott Moffett's testimony in both oral and written form constituted improper bolstering, giving the evidence more weight than it deserved and in the process, giving the state an undue advantage.

The state argues that Moffett's statement to the police comes within the rule that past recollections are admissible when a witness has no present recollection after referring to a memorandum, but testifies that he once knew the facts and they were accurately and correctly recorded in the memorandum he identifies. *Watson v. Meredith Development Co.*, 410 S.W.2d 338, 341 (Mo.App.1966); See also *State v. Bradley*, 234 S.W.2d 556, 560 (Mo.1950). However, Thomas argues that the admission of Moffett's statement to the police constituted improper bolstering because even though Moffett had no memory of what he said in his statement, nonetheless, the contents of the statement were consistent with Moffett's trial testimony.

Thomas correctly cites to the case of *State v. Seever*, 733 S.W.2d 438 (Mo. banc 1987), for the proposition that the use of duplicative and corroborative extrajudicial statements is substantially restricted where a witness testified from the stand. However, in some cases, as held by the Missouri Supreme Court in *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990), a witness' extrajudicial statement is harmless error, when,

for example, the statement adds nothing substantial and the witness is available for cross-examination. In matters involving the admission of evidence, the court reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *Id.* (citation omitted).

The sequence of trial events leading up to the admission of the complained of statement began with the testimony of Detective Raymond Rast. Detective Rast testified that when he initially interviewed appellant Thomas, he was told by Thomas that he last saw the victim at the Eagles' Club after which he drove to the home of Scott Moffett. Thomas told Rast that he was at Moffett's home for approximately four hours, drank a six-pack of beer with Moffett that he had brought with him and then drove to his home. Thomas denied that Moffett was in bed when he arrived and stated that Moffett was wearing jeans that evening. Thomas also denied taking anything from Moffett's home.

At trial, Moffett testified that he was in bed, in his underwear, watching television and that it was around midnight when Thomas came to his door. Moffett stated that he answered the door wearing his underwear. Moffett testified that Thomas told him that he had "screwed up," that he had picked up a woman at the bar, that she had pulled a gun on him and that he had hit her once. According to Moffett, Thomas stayed at his home only a short time. Moffett denied that Thomas had brought beer to his house, but he testified that Thomas told him that he (Thomas) and this woman had engaged in sex and that Thomas had asked him for a flashlight. However, when Moffett was questioned concerning a statement he gave to the Independence Police, Moffett remembered talking to the police, but for the most part, could not remember exactly what he told them.

The prosecutor then showed Moffett State's Exhibit 21, a statement handwritten by Detective Rast, as given by Moffett. The prosecutor questioned Moffett as to whether he recalled the contents of the statement and Moffett stated that he did

not. However, Moffett did acknowledge that he had been truthful when he made the statement.

The state recalled Detective Rast who testified that Exhibit 21 was the statement given by Moffett. Detective Rast then testified to selected portions of the statement without going into great detail. Detective Rast testified that Moffett read and signed the statement. The state requested admission of Exhibit 21, but the trial court deferred its ruling. During deliberation, the jury requested the statement of Moffett. The trial court then admitted Exhibit 21 and sent the exhibit to the jury.

■ It is first noted that a portion of Exhibit 21 was inconsistent with Moffett's testimony at trial. In his statement to the police, Moffett said that when Thomas told him he screwed up, Thomas admitted that he killed someone. At trial, Moffett specifically denied hearing appellant say this. This portion of Exhibit 21 was admissible as substantive evidence under § 491.074, RSMo 1986. Furthermore, the portion of the statement wherein Moffett related to Detective Rast that Thomas admitted that he killed someone was an admission in the nature of a confession to the crimes charged. *See, State v. Jennings,* 815 S.W.2d 434 (Mo.App.1991). This admission directly implicated Thomas in the crime and was central to the state's case. *Id.*

■ Otherwise, the content of Moffett's statement to the police was somewhat the equivalent of his trial testimony except that in testifying at trial, Moffett was both evasive and vague, claiming difficulty in recalling his conversation with Thomas. Moffett repeatedly equivocated in his testimony at trial by giving an answer, but stating before, in the course of and after his answers on significant issues, "I don't know" and "I don't remember." For example, when Moffett was asked what time it was when Thomas came to his house, he testified at trial as follows:

A. I'd say somewhere around midnight. I don't know.

When Moffett was asked at trial what Thomas said to him when Thomas came to his house, Moffett answered as follows:

A. I don't know, he just—we started talking. I don't know, I don't remember just how it started, and we were talking, I don't know, one thing led to another, I don't know. And then he told me that he thought he had screwed up. He'd picked this gal up at the bar, and they'd went out and she tried to—she pulled a gun on him, and he hit her one time, and that's—I don't know just exactly. That's about all.

Moffett's statement to the police did not contain the "I don't know" and "I don't remember" equivocations of his trial testimony. Moffett's equivocations at trial arguably rendered much of his trial testimony either inconsistent with his unequivocal statement to the police or brought his statement to the police within the exception for past recollection recorded. Furthermore, any duplication of Moffett's trial testimony by the admission of Exhibit 21 was harmless in that it added nothing substantial, not otherwise admissible as inconsistent or past recollection recorded, and Moffett was cross-examined. *State v. McMillin*, 783 S.W.2d at 98.

Point one is denied.

In point two, Thomas takes issue with portions of the closing argument, wherein he claims that the trial court erred in overruling his objections to the prosecutor's repeated references to him as "this murderer." Thomas claims these references violated the presumption of innocence and was calculated to incite in the jurors a passion or prejudice against him.

■ The trial court has wide latitude in controlling closing argument as well as the discretion to determine the prejudicial effect of closing argument. The decision of the trial court will not be disturbed absent a showing that its discretion has been abused.

■ Thomas correctly points out that the fundamental rule that an accused in a criminal proceeding is presumed innocent until the state proves him guilty beyond a reasonable doubt. *State v. Neal*, 526 S.W.2d 898, 902 (Mo.App.1975). However, as equally correctly pointed out by the State, a prosecutor may state an opinion or conclusion which he fairly draws from the evidence, as to an appellant's guilt. *State v. Jackson*, 499 S.W.2d 467, 471 (Mo.1973). As stated by the court in *Jackson* at p. 471:

Here, if the jury believed the State's witnesses, defendant *was* a murderer, and the jury so found. It is apparent to us that the prosecutor was merely indicating a belief of guilt drawn directly from the State's evidence, and the addition of the term 'no good,' while perhaps unnecessary, was also fairly justified by the evidence.

■ Thomas claims that the prosecutor completely ignored the presumption of innocence and voiced his opinion of guilt. This however, is not true, as is evidenced by the prosecutor's following statement:

[T]his murderer violated the most basic law, Thou shall not kill. This man, as he sits here now, is presumed innocent.

Further, the jury was instructed pursuant to MAI–CR3d 300.02 as follows:

The defendant is presumed to be innocent unless and until, during your deliberations upon your verdict, you find him guilty....

The arguments of counsel must be considered in the full context of the trial and closing argument. By virtue of the corrective statements made by the prosecutor and the above Instruction, no prejudice can be said to have occurred.

■ Although the prosecutor's references herein are not grounds for reversal, they cannot be classified as necessary or entirely proper. Prosecutors are, however, cautioned to exercise self-restraint and to refrain from applying unbecoming names or epithets to defendants which tend to inflame and impassion a jury or appeal to prejudice. *State v. Hurt*, 668 S.W.2d 206, 214 (Mo.App.1984).

Point two is denied.

In point three, Thomas argues that the trial court erred in admitting certain of the State's exhibits which were photographs depicting the victim's body and the crime scene. Thomas argues that any probative value the photographs may have had was

outweighed by the prejudicial effect in that the photographs were cumulative, gruesome and unduly inflammatory.

Thomas overlooks the overwhelming authority which vests the trial court with broad discretion in admission of photographs. *State v. McMillin*, 783 S.W.2d at 82. (citation omitted). Missouri courts allow admission of photographs to corroborate the testimony of a witness, to assist the jury in understanding the facts and testimony of witnesses and to prove an element of the case, even though the photographs may be gruesome. *Id.* Photographs are also relevant when they depict the condition and location of the body. *State v. Evans*, 639 S.W.2d 820, 822 (Mo. 1982).

Seven of the complained of photographs were of various portions of the victim's body. These photographs were relevant to show the position of the body as well as to show various items found on and around the body as well as to corroborate the state's theory that the victim was murdered in Thomas' vehicle and her body was left at the scene. Two of the complained of photographs depicted the victim's clothes, which were blood-soaked. All of the photographs depicted details that corroborated the testimony of various state witnesses. Additionally, several of the photographs were relevant as they depicted the condition and location of the body.

Contrary to Thomas' assertion, the photographs were not improperly admitted. Unfortunately, gruesome crimes produce gruesome, yet probative photographs. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991).

Point three is denied.

In point four, Thomas argues that the trial court erred in overruling his motion for acquittal at the close of all the evidence because the state failed to prove, beyond a reasonable doubt, his criminal agency. He alleges that the State failed to prove that he knowingly caused the death of Roberta Mosher by striking her.

As cited by Thomas, when a case is based upon circumstantial evidence, the test for determining whether the state introduced sufficient evidence to allow submission of the case to a jury requires neither conclusive proof of guilt nor proof of the impossibility of innocence. *State v. Luna*, 800 S.W.2d 16, 19 (Mo.App.1990).

The evidence must be viewed in the light most favorable to the verdict and the state is afforded all reasonable inferences from that evidence. *State v. Rodden*, 728 S.W.2d 212, 213 (Mo. banc 1987). From that viewpoint, the evidence adduced was sufficient to prove the criminal agency of Thomas.

On the evening of September 30, 1988, Thomas left Tommy's Tavern with Mosher, the victim. There was evidence that the two left arm-in-arm and were later seen by Thomas' vehicle, Mosher standing by the passenger's side and Thomas on the driver's side. According to Scott Moffett, Thomas came to Moffett's house at about midnight that evening. Thomas told Moffett that he thought he had "screwed up," that he had picked up a woman at the bar, that "they had sex," that she pulled a gun on him and that he had hit her once. Thomas also asked Moffett if he could borrow a flashlight.

Head and pubic hair indistinguishable from the victim's were found in Thomas' vehicle. A bootprint consistent with having been made by Thomas' boot that he had on the evening in question were found at the scene. Also the body of the victim was left in an area near where Thomas worked in his position as city maintenance worker. From the evidence the jury could have found Thomas guilty of second degree murder.

Point four is denied.

In his fifth point on appeal, Thomas complains that the trial court committed plain error by failing to control the prosecutor's improper cross-examination of him because the prosecutor testified under the guise of cross-examination and many of the questions had no evidentiary support.

Thomas complains of three instances the first being the prosecutor improperly cross

examined him regarding his wife's whereabouts.

■ The trial court is vested with broad discretion in determining the extent of cross-examination. *State v. Schlup,* 785 S.W.2d 796, 801 (Mo.App.1990) (citation omitted). When a defendant elects to testify in his own defense, he may be cross-examined in detail as to any matter generally referred to in his direct examination. *Id.* A defendant cannot complain about the state's inquiring as to matters first brought into the case by the defendant. *Id.*

■ On direct examination Thomas was asked if his wife had ever ridden in his vehicle and Thomas answered affirmatively. Thomas was also asked what was the color of his wife's hair and he responded dark brown. Thus, the prosecutor, having the door opened by Thomas, was entitled to inquire as to Thomas' wife. No error, plain or otherwise, occurred.

Thomas also complains about a question he was asked by the prosecutor concerning whether he was aware that a photograph of the victim was taken to the Eagles' Club but that no one at the Eagles' Club recognized the victim as having been present on the night of September 30, 1988. Thomas responded that he had read that in a report. Thomas does not state why this question is improper and this court will not engage in mind-reading, especially for plain error.

■ Thomas also complains that the prosecutor misstated the evidence when he posed a question to Thomas asking him to explain why he went to his boss and asked to borrow heavy equipment to take to the pit area, where the body of the victim was later discovered.

Thomas' boss, Michael Williams, was called as a rebuttal witness for the state. Williams testified that Thomas had come to him and asked to use equipment to do a job "at the farm." The farm, also called the "Mastman property" was where the body of the victim was discovered. The prosecutor did not act improperly in questioning Thomas as to his reasons for wanting to borrow equipment to take to the pit area.

The prosecutor did not act improperly for any of the reasons alleged by Thomas in point five.

In his sixth and final point, Thomas charges that the trial court erred in commenting on his objections in a derogatory manner which sent a message to the jury that the court believed his defense was meaningless. Once again, Thomas requests plain error review.

■ The record has been examined and in neither of the two instances complained of was the trial court acting improperly. The trial court was merely stating the basis for its ruling which is entirely permissible. Point six is without merit and is denied.

The judgment of conviction is affirmed.

All concur.